[No. H015001. Sixth Dist. Jan. 14, 1997.]

EXXON CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
SHIRLEY CHENG KOUTNEY et al., Real Parties in Interest.

**COUNSEL**

Sheuerman & Martini, Alan L. Martini, McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, John M. Rochefort, Kurt Osenbaugh and Eugene A. Burrus for Petitioner.

No appearance for Respondent.

Tanke & Willemsen, Tony J. Tanke, Ruby & Schofeld, Allen Ruby, Cotchett & Pitre, Joseph W. Cotchett and Bruce L. Simon for Real Parties in Interest.

**OPINION**

**WUNDERLICH, J.**—Defendant Exxon Corporation petitions for writ of mandate following the trial court's denial of its motions for summary adjudication on various causes of action, primarily antitrust violations. The key question is whether or not for purposes of the Cartwright Act the relevant market for assessing anticompetitive behavior is all gasoline or Exxon gasoline. The trial court concluded the relevant market is a factual question, such that Exxon gasoline could be shown to be the relevant market. We disagree and thus grant Exxon's petition for writ of mandate.

## BACKGROUND

Plaintiffs, 35 Exxon franchisee service station dealers, filed a complaint against Exxon stating 16 causes of action for Cartwright Act violations, business torts, and related claims. The factual essence of these claims is that the plaintiff dealers are locked into franchise relationships with Exxon and have invested considerable money and effort in acquiring their service stations, but the terms of the agreements make it difficult for them to compete both with independent dealers and with Exxon-owned stations. This is because Exxon compels the franchisees to buy all their Exxon gasoline from Exxon at a price considerably higher than the "rack price" at which Exxon sells the gasoline to independent jobbers.[1] The franchisees claim they are at a competitive disadvantage in competing with these jobbers, with company-owned stations, and with independent operators who can all obtain fuel more cheaply than can plaintiffs.[2] Further, the jobbers are forbidden to resell their Exxon fuel to plaintiffs as franchisees. Plaintiffs claim the price discrepancies between their cost and that of the jobbers have no reasonable relationship to the value of any distribution services which the jobbers perform in marketing the product. Although the agreements with Exxon do not preclude plaintiffs from selling other brands of gasoline, they may not do so unless they put in separate tanks and pumps, an economically prohibitive arrangement.

In making their Cartwright Act claims of both horizontal and vertical restraints, plaintiffs maintain that the relevant market is not the motor fuel market (all gasoline), but only the wholesale market for Exxon brand fuel. This allegation is crucial because the parties are agreed that Exxon does not own a dominating share of the petroleum market and therefore is not in a position to monopolize or dominate that market. It does, however, have a natural monopoly over its own product, and it is that dominance and control which plaintiffs challenge.

Plaintiffs also alleged violations of oral promises not to withdraw the Exxon credit card from the California market and to remodel or repair certain service stations. Exxon contends such alleged promises are inconsistent with the express language of the parties' integrated agreements.

Exxon moved for summary adjudication of several causes of action. The trial court granted summary adjudication of plaintiffs' first cause of action,

---

[1] The franchisees pay Exxon the "Dealer Tank Wagon" (DTW) price for a supply of gasoline delivered to their stations. The jobbers, independent distributors who buy and transport Exxon gasoline from the refinery, pay a generally lower "rack" price.

[2] According to Exxon, independent service station operators, served by the jobbers, are located in rural areas, whereas the franchisees are located in metropolitan areas.

for horizontal restraint, because there was no evidence of an agreement to restrain trade between Exxon and its jobbers. However, on the other causes of action, the trial court agreed with plaintiffs that triable issues of fact existed.

The trial court denied the motion for summary adjudication of the vertical restraint claim because, in its opinion, whether the product is "all gas" or "Exxon gas" is a question of fact, and whether there is consumer preference for Exxon gas as a single brand is also a question of fact. The court cited *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 953], holding that the relevant market is a triable issue on the question of the reasonableness of restraints. For this same reason, the court also denied the motions for summary adjudication of the plaintiffs' monopoly claim and their price overcharging claim. The court similarly denied summary adjudication of the claim of tortious interference or breach of the implied covenant, because there are factual issues. (Citing *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740].) The factual issues referenced are the same as those cited regarding existence of the relevant market. Plainly, the trial court believed that because the claim for tortious interference stands or falls on a showing of an antitrust violation, the same facts which produce dispute as to those issues produce dispute as to the tort claims.

In denying the motion for summary adjudication of the claims based on the agreements of the parties, the trial court found questions of fact existed whether the claimed integrated contract was inconsistent with plaintiffs' allegations that Exxon breached promises to continue its credit card in effect and to remodel and repair certain stations. However, the court did grant Exxon's motion for summary adjudication of the *Seaman's* cause of action for tortious breach of implied covenant (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158]), because a franchise relationship is commercial in nature and does not give rise to tort liability for breach. (*Harris* v. *Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70 [17 Cal.Rptr.2d 649].)

Exxon then filed a statutory petition for mandate, claiming the trial court erred in failing to grant summary adjudication. (Code Civ. Proc., § 437c, subd. (*l*).) We issued an alternative writ of mandate, and the parties responded. We are now called upon to determine if in fact the trial court was correct in denying Exxon's motions for summary adjudication of certain issues, or whether summary adjudication should have been granted. The definition of the relevant market is the critical issue.

DISCUSSION

I

*Summary Adjudication*

■ The trial court must grant summary adjudication where the moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) "Summary judgment is mandatory where no triable issues exist as to a material fact, and if the documentation submitted on the motion entitles the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) When, as here, defendants seek summary judgment, their supporting documentation must either establish a complete defense to the plaintiff's action or demonstrate an absence of an essential element of the plaintiff's case. When defendants establish the foregoing, and the plaintiff's opposing documentation does not show either a triable issue of fact with respect to the defense or that an essential element exists, summary judgment should be granted. [Citations.] These general principles also apply to an appellate court's review of a summary judgment ruling, which is conducted de novo. [Citations.]" (*Thompson* v. *Halvonik* (1995) 36 Cal.App.4th 657, 661 [43 Cal.Rptr.2d 142].) For summary judgment to be granted, "[t]he moving party must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial. [Citations.]" (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674].)

Although Exxon initially complains that the trial court order did not meet the requirements of Code of Civil Procedure section 437c, subdivision (g) in that it insufficiently specifies what evidence is in conflict, we believe that absent a demand for greater specificity in the trial court, the order suffices procedurally. (See *Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 129-130 [240 Cal.Rptr. 439]; see also *Miller* v. *Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1621 [2 Cal.Rptr.2d 796].)

■ We note also that plaintiffs object to consideration by writ review because certain causes of action remain, regardless of our decision, and thus a trial will go forward even if we grant the writ. However, we conclude pretrial review is appropriate here, where the issues ruled on by the trial

court contain the heart of plaintiffs' case and the trial might well be simplified if we find the trial court erred.[3]

Preliminarily, it is important to emphasize what this case is *not* about: plaintiffs have not alleged any cause of action for price discrimination (under the federal Robinson-Patman Act or the California Unfair Practices Act) nor have they sued all major oil companies in an attempt to demonstrate a conspiracy or concerted action. Nor do we have before us individual claims of unconscionable contracts (franchise agreements). And we stress that this case concerns a franchise relationship, a specific and highly regulated contractual business arrangement.

## II

### Antitrust Causes of Action

■ The Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), like the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.[4] Restraint of trade may be horizontal or vertical. "Contracts, combinations and conspiracies in restraint of trade covered by Section 1 of the Sherman Act are of two types, horizontal or vertical. Horizontal combinations are cartels or agreements among competitors which restrain competition among enterprises at the same level of distribution. They are ordinarily illegal per se. [Citations.] Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained. Vertical non-price restraints are tested under the rule of reason; that is, the

---

[3]In addition, numerous other cases in the state raise the same or similar issues. (See also *Ajir* v. *Exxon Corp.* (N.D.Cal. No. C-93 20830 RMW PVT) [summary judgment granted on same issues].)

[4]State courts have liberally applied federal Sherman Act doctrine in interpreting the Cartwright Act. (See, e.g., *Roth* v. *Rhodes* (1994) 25 Cal.App.4th 530, 542 [30 Cal.Rptr.2d 706]; *Cellular Plus, Inc.* v. *Superior Court* (1993) 14 Cal.App.4th 1224, 1242 [18 Cal.Rptr.2d 308]; *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020, 1042 [219 Cal.Rptr. 203] (*Gianelli*).)

However, in their final brief, plaintiffs insist the Cartwright Act is much broader than the Sherman Act, and thus they should not be bound by cases interpreting the Sherman Act, especially concerning vertical restraints and market definition. (See *State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1160-1164, 1168 [252 Cal.Rptr. 221, 762 P.2d 385] [Cartwright Act modeled after earlier Texas and Michigan acts, but not broader than Sherman Act].) They cite, for example, *Texaco, Inc.* v. *Hasbrouck* (1990) 496 U.S. 543 [110 L.Ed.2d 492, 110 S.Ct. 2535], wherein the Supreme Court held that discounts to wholesale buyers who also resold gasoline at retail were illegal price discrimination because Texaco failed to prove the discounts were functionally related. But *Hasbrouck* was a price discrimination case brought under the Robinson-Patman Act, and here plaintiffs have made no Robinson-Patman (or similar California Unfair Practices Act) allegations in their complaint.

plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail." (*Muenster Butane, Inc.* v. *Stewart Co.* (5th Cir. 1981) 651 F.2d 292, 295, fns. omitted (*Muenster Butane*).)

The United States Supreme Court has intimated that intrabrand competition is not a concern of the antitrust laws (e.g., *Continental T.V., Inc.* v. *GTE Sylvania, Inc.* (1977) 433 U.S. 36, 52, fn. 19 [53 L.Ed.2d 568, 581, 97 S.Ct. 2549]), and a California court has held that an antitrust plaintiff attacking vertical restraints cannot make out a case unless the plaintiff can show some anticompetitive effect in the larger, interbrand market. (*Gianelli, supra,* 172 Cal.App.3d at pp. 1044, 1048.) The *Gianelli* case also finds the prevailing standard to be the "rule-of-reason" which measures whether the anticompetitive aspect of a vertical restraint outweighs its procompetitive effects. (*Id.* at p. 1048.) And it is plaintiff's burden to make the required showing of a " 'substantially adverse effect on competition in the relevant market.' " (*Id.* at p. 1049.)

A long line of federal cases stands for the general proposition that vertical restraints are permissible unless a harmful effect on interbrand competition and an anticompetitive purpose can be shown. (E.g., *O.S.C. Corp.* v. *Apple Computer, Inc.* (9th Cir. 1986) 792 F.2d 1464, 1469; *Seagood Trading Corp.* v. *Jerrico, Inc.* (11th Cir. 1991) 924 F.2d 1555, 1569; *Supermarket of Homes* v. *San Fernando Valley Bd.* (9th Cir. 1986) 786 F.2d 1400, 1405; *Ron Tonkin Gran Turismo* v. *Fiat Distributors* (9th Cir. 1981) 637 F.2d 1376, 1387-1388; *Red Diamond Supply, Inc.* v. *Liquid Carbonic Corp.* (5th Cir. 1981) 637 F.2d 1001, 1007.) These cases are consistent with the many cases holding that a supplier cannot have a monopoly, normally, in its own product. (E.g., *International Logistics Group* v. *Chrysler Corp.* (6th Cir. 1989) 884 F.2d 904, 908 [monopoly of a single brand is not an antitrust violation]; *Stearns* v. *Genrad, Inc.* (4th Cir. 1984) 752 F.2d 942, 946; *Smalley & Co.* v. *Emerson & Cuming, Inc.* (D.Colo. 1992) 808 F.Supp. 1503, 1512.)

■ In addition, case law holds that the need to prove market power is a threshold consideration in an antitrust case and is the sine qua non of recovery.[5] These cases are collected in *O.S.C. Corp.* v. *Apple Computer, Inc.* (C.D.Cal. 1985) 601 F.Supp. 1274, 1291, fn. 8, and include *Graphic Products Distributors* v. *Itek Corp.* (11th Cir. 1983) 717 F.2d 1560, 1568;

---

[5]"A leading commentator on vertical restraints has suggested that proof of the antitrust defendant's 'substantial' market power should be a preliminary hurdle in all restricted distribution (vertical restraint) cases. '[I]f a firm lacks market power, it cannot affect the price of its product,' and thus any vertical restraint could not be anticompetitive at the interbrand level. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 16 (1981)." (*Muenster Butane, supra,* 651 F.2d at p. 298.)

*Muenster Butane, supra,* 651 F.2d 292; *General Leaseways* v. *National Truck Leasing Ass'n* (7th Cir. 1984) 744 F.2d 588, 596; see also *Rutman Wine Co.* v. *E. & J. Gallo Winery* (9th Cir. 1987) 829 F.2d 729. In specifically interpreting the Cartwright Act, the court in *Roth* v. *Rhodes, supra,* 25 Cal.App.4th at page 542, emphasized that since the *Sylvania* decision by the United States Supreme Court (*Continental T.V., Inc.* v. *GTE Sylvania, Inc., supra,* 433 U.S. 36), federal courts applying the rule of reason to vertical restraints have required a threshold inquiry into the defendant's market power, which is usually equated with market share. " 'To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude. . . . Ordinarily, a plaintiff to do this must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.' . . ." *(Roth* v. *Rhodes, supra,* 25 Cal.App.4th at p. 542 [citations omitted].)

▇▇▇ Exxon has presented uncontradicted evidence that it does not have a controlling share of the petroleum gasoline market, and that therefore as a matter of law plaintiffs cannot prevail on their antitrust claims. Indeed the parties agree that Exxon accounts for less than 10 percent of the market.

The trial court apparently placed weight on the declaration of plaintiffs' expert to raise a material triable issue of fact. Although we acknowledge that in some cases, the relevant market may be a question of fact, here we find it is a matter of law, as plaintiffs' theory of relevant market has no real support in the case law.

The United States Supreme Court has declared that the relevant market is determined by considering "commodities reasonably interchangeable by consumers for the same purposes." (*United States* v. *Du Pont & Co.* (1956) 351 U.S. 377, 395 [100 L.Ed. 1264, 1280-1281, 76 S.Ct. 994].) Or, in other words, the relevant market is composed of products that have reasonable interchangeability for the purpose for which they are produced. (*Id.* at p. 404 [100 L.Ed. at pp. 1285-1286].) The Supreme Court used the example of different soft drink formulae, noting that one can hardly say each one is an illegal monopoly. (*Id.* at p. 393 [100 L.Ed. at pp. 1279-1280.) Here, the reasonable interchangeability for the purpose for which gasoline is produced (use in consumers' motor vehicles) mandates the relevant market to be all gasoline, not the wholesale market for one brand of gasoline.

In *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d 842, the California Supreme Court concluded that the market definition (all

classes of legal advertisements versus notices of trustee sales only) was a mixed question of law and fact that could not be resolved on the limited record before it. (*Id.* at p. 855.) The record before us is anything but limited, and we find that the relevant market here is a question of law and is defined as the market of all gasoline. "[T]he issue of fact becomes one 'of law' and loses its 'triable' character if the undisputed facts leave no room for a reasonable difference of opinion. [Citation.]" (*Terry* v. *Atlantic Richfield Co.* (1977) 72 Cal.App.3d 962, 967 [140 Cal.Rptr. 510].) In the market of all gasoline, the parties agree that Exxon's market share is less than 10 percent. This is not enough to demonstrate a restraint of trade. Plaintiffs cannot show that Exxon's activity restrains trade and impairs competition significantly. (See *Roth* v. *Rhodes, supra,* 25 Cal.App.4th at p. 542; *Gianelli, supra,* 172 Cal.App.3d at p. 1049; *Davis-Watkins Co.* v. *Service Merchandise* (6th Cir. 1982) 686 F.2d 1190, 1202.)

Plaintiffs presented the opinion of Keith Leffler, a leading petroleum economist, who based his opinion on the premise that the relevant market was the wholesale market for Exxon brand gasoline. Thus, his opinions on the effect of Exxon's practices on the entire retail market are purely speculative. Leffler opined that the vertical restraints can have an effect on the retail price of gasoline, in that the inability of Exxon dealers to purchase Exxon products through the competitive jobber market protects a noncompetitive wholesale and retail price structure throughout the entire markets in which these dealers operate. Exxon had offered documentary evidence that the retail market for gasoline and the wholesale market for gasoline were each highly competitive and operated independently of each other. These factual showings were not rebutted. Leffler's speculations do not rise to the status of contradictory evidence. ■ And the court is not bound by an expert opinion that is speculative or conjectural or that is based on an incorrect legal theory. (See *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630]; *Painter* v. *Workers' Comp. Appeals Bd.* (1985) 166 Cal.App.3d 264, 271 [212 Cal.Rptr. 354].) In fact, Leffler himself declared that the retail gasoline market is highly competitive: "At the retail level, consumers are very responsive to relatively small differentials in prices across gasoline brands." ■ This statement undermines his opinion that Exxon's vertical restraints may have an anticompetitive effect.[6]

We also find the major cases cited by plaintiffs are inapposite here. It is important to note that these cases do not concern franchise relationships as

---

[6]Leffler's statements imply that anticompetitive injury results only if all major producers use the same dual distribution system. Then, according to him, the market becomes dominated by that system in such a way that the price of gasoline is kept artificially high because all these producers keep the price higher for their franchised dealers than for the rack market. While this might be a statement of a monopoly situation, it lacks the essential element of combination or illegal agreement. There are no such allegations in the complaint. Leffler's

does the present case. Plaintiffs rely heavily upon *Redwood Theatres, Inc.* v. *Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687 [248 Cal.Rptr. 189], to show that the market for a particular product may be the relevant market for antitrust purposes even when the product is part of a larger market in which the defendant does not dominate. In *Redwood Theatres*, the defendant distributors had a small share of the film market but a large share of "first run" films, and were therefore found to have a potential for monopoly of that market. According to plaintiffs, Exxon similarly has a small share of the gasoline market, but a dominating control over the market for Exxon gas. The court in *Redwood Theatres* agreed that the measure of validity of vertical restraints is the rule-of-reason and that the reasonableness of a restraint is normally a factual issue to be determined at trial. (200 Cal.App.3d at pp. 712-713, citing *Corwin* v. *Los Angeles Newspapers Service Bureau, supra,* 4 Cal.3d at p. 855.) However, on its facts, *Redwood Theatres* differs from this case in that first run films are a unique product in which the distributor defendant enjoyed a monopoly, or near monopoly, whereas here, gasoline is a commonly and widely available product which can be bought under many different brand names so that Exxon cannot be said to have a dominating market share in that market. Plaintiffs allege that there exists a consumer preference for Exxon, but they have presented no evidence to show this, and indeed Exxon's less than 10 percent market share belies their claim.

The refusal of major film distributors to deal with plaintiff Redwood Theatres could amount to an anticompetitive practice, potentially ruinous to the small theatre operator, against which the Cartwright Act is designed to guard. We question the application of the *Redwood Theatres* analysis to a franchise case. In a franchise relationship, the franchisee presumably accepts the burdens of the arrangement to reap some benefits. For instance, here Exxon dealers have to buy their gas from Exxon at its wholesale to dealer price rather than its rack price; but they get in return the Exxon institutional advertising, marketing support, and related benefits as well as no transportation costs. Thus they are situated differently from the jobbers, who get none of these things but buy the gasoline for less. In the film industry, there is no justification, other than personal economic benefit to the studios, in their refusal to sell a particular product to a small theater. And this refusal tends to drive small theaters out of business and thus hamper competition at the retail level, restricting the consumer to the larger theaters which have the muscle to swing the studio deals. So in *Redwood Theatres*, applying the Cartwright Act serves the fundamental purpose of the antitrust laws, which is to protect competition at the retail level. In a franchise situation, as here, applying the antitrust law does not serve that purpose.

assertion that an individual producer such as Exxon is free to use the system since it will not suffer in competition by keeping its prices high so long as everyone else does the same thing is speculative.

Plaintiffs also rely on *Eastman Kodak Co.* v. *Image Technical Services, Inc.* (1992) 504 U.S. 451 [119 L.Ed.2d 265, 112 S.Ct. 2072]. In that case, the plaintiffs were independent service organizations (ISO's) that serviced copying and micrographic equipment manufactured by Kodak. Kodak adopted policies limiting availability of replacement parts for its machines to ISO's. The ISO's filed an antitrust suit contending that Kodak unlawfully tied the sale of service for its machines to the sale of parts and had unlawfully monopolized the sale of such services and parts in violation of the Sherman Act. The Supreme Court reversed a district court summary judgment for Kodak. The high court (three justices dissenting) held that there were factual issues concerning Kodak's market power in the service and parts markets, and that lack of such market power could not be assumed just because such power was absent in the total equipment market. Kodak had argued that it lacked market power in the primary equipment market; but the court said that was not dispositive. The fact that Kodak controlled nearly 100 percent of the parts market and 80 to 95 percent of the service market sufficed to withstand summary judgment on the monopoly claims. (*Id.*, at pp. 481-483 [119 L.Ed.2d at pp. 293-294, 112 S.Ct. at p. 2090].)

Plaintiffs point particularly to the discussion rejecting Kodak's argument that, as a matter of law, a single brand of a product can never be a relevant market. (504 U.S. at pp. 481-484 [119 L.Ed.2d at pp. 293-295, 112 S.Ct. at pp. 2090-2091].) The relevant market for antitrust purposes, "is determined by the choices available to Kodak equipment owners." Service and parts for Kodak equipment are not interchangeable with service and parts for other manufacturer's products; therefore the relevant market from the perspective of owners of Kodak equipment consists only of those companies that service such equipment. In that market, Kodak has a monopoly. (*Id.*, at pp. 481-483 [119 L.Ed.2d at pp. 293-294, 112 S.Ct. at p. 2090].) The situation here is different. Exxon gas is interchangeable with other brands of gasoline. From the consumers' perspective, there is no "lock in" to Exxon gas. Therefore they are not in a similar position to the owners of Kodak equipment who must buy parts and service from Kodak ISO's. From the perspective of retail gasoline consumers, the relevant market is all gas, not just Exxon gas.

The *Gianelli* court summarized: "While it is true that there is generally 'a greater reluctance to uphold a grant of summary judgment when the rule of reason is the appropriate standard[,]' . . . it is also true that where there exists 'no tenable *per se* boycott theory "appellants must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory . . ."' . . . and consequently to survive a summary judgment

motion." (172 Cal.App.3d at p. 1049, [citations omitted].) No such evidence has been presented.[7]

■ In a related argument, plaintiffs contend the restrictions in their lease agreement prohibiting the use of Exxon's tanks, lines and equipment for the sale of any product other than Exxon brand gasoline is an illegal tying arrangement.[8] But Exxon's lack of market power eliminates a prerequisite to plaintiffs' success on this claim. Plaintiffs must prove power in the tying product (here, service station sites) in order to prevail. (*Grappone, Inc.* v. *Subaru of New England, Inc.* (1st Cir. 1988) 858 F.2d 792.)

Plaintiffs' real complaint is that they are being oppressed within a contractual relationship with the manufacturer. There are legal remedies for oppressive conduct regarding a contractual relationship, but they are not antitrust remedies. Cases hold that a franchisor's ability to "coerce" its franchisee does not show market power and does not invoke antitrust concerns. (See, e.g., *Tominaga* v. *Shepherd* (C.D.Cal. 1988) 682 F.Supp. 1489, 1495; *Mozart Co.* v. *Mercedes-Benz of North America, Inc.* (9th Cir. 1987) 833 F.2d 1342, 1346-1347 [analysis for vertical restraint and tying claims must be made at the precontract stage, not after a franchise agreement has been signed].)

The franchisees' "lock in" to Exxon results from a business relationship of their choosing, the franchise, whose terms were freely entered into by both parties. If the franchise agreement is unconscionable or adhesive it may be subject to rescission or reformation. However, these facts do not implicate antitrust concerns. Exxon's conduct vis-à-vis the franchisees is part of a negotiated business relationship and is not a restraint of trade; it does not directly impact the retail market. And there was no "lock in" until plaintiffs voluntarily assumed their roles as franchisees; they had the entire spectrum of gasoline sellers from which to choose in deciding how to structure their service station businesses.

Recently, a federal district court in Pennsylvania decided similar issues in an action brought against the franchisor by 40 percent of its franchisees. In

---

[7]As plainly described by the court in *Muenster Butane*: "Muenster Butane's fundamental mistake throughout this case has been to view the product market as confined to Zenith sets. The record contains no suggestion that Zeniths are unique or that Zenith dealers enjoy a downward sloping demand curve for their sets. Indeed, the uncontradicted testimony of Nick Heffley indicates that competition between Zenith dealers and dealers in other brands of television sets was 'so keen' that he could not fix a minimum price for his Zeniths." (651 F.2d at p. 296.)

[8]Exxon's assertion that plaintiffs' tying claims are barred by a consent decree entered in *Bogosian* v. *Gulf Oil Corp.* (E.D.Pa. 1985) 621 F.Supp. 27, a case where such arrangements were allegedly validated as part of the consent decree and in which many plaintiffs here were class members, is unsupported by appropriate documentary evidence showing terms, identities and facts.

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.* (E.D.Pa. 1996) 922 F.Supp. 1055), the court held that the relevant market definition that franchisees urged in support of their antitrust claims, one that encompassed the market for ingredients and supplies among franchisees, failed as a matter of law. The court concluded that the restraints at issue were, as here, vertical nonprice restraints and not price maintenance, and that market power cannot be established by showing contractual power arising out of the franchise agreement. (*Id.* at pp. 1060-1062.)

Similarly, we conclude the relevant market is all gasoline, and Exxon, as a matter of law, does not have significant power for antitrust purposes in that market.

### III

#### *Other Business Torts*

■ Plaintiffs also sued Exxon for monopolization, price overcharging, tortious interference with business relationship and breach of the covenant of good faith and fair dealing, all in relation to their inability to purchase Exxon gas at a lower cost from jobbers. The trial court concluded these related claims also depended on the definition of relevant market, a triable issue of fact. Again, we disagree.

As to the monopolization cause of action, Exxon has no dangerous probability of obtaining a monopoly in the relevant market of all gasoline, because consumers have many interchangeable choices. (See *Spectrum Sports, Inc.* v. *McQuillan* (1993) 506 U.S. 447, 454-458 [122 L.Ed.2d 247, 256-258, 113 S.Ct. 884, 890-891]; see also *Bushie* v. *Stenocord Corporation* (9th Cir. 1972) 460 F.2d 116, 120 [unless manufacturer used his natural monopoly in his own product to gain control of the relevant market in which his products compete, the antitrust laws are not violated].)

As to price overcharging, Exxon presented evidence that its DTW prices fell within the range of DTW prices charged by other major oil companies to their dealers.[9] This is all that is required. (See *Au Rustproofing Center* v. *Gulf Oil Corp.* (6th Cir. 1985) 755 F.2d 1231, 1235; *TCP Industries, Inc.* v. *Uniroyal, Inc.* (6th Cir. 1981) 661 F.2d 542, 548-549.) Exxon distributes to two different classes, each performing different functions. Leffler's opinion that the difference in price between DTW price and rack price is not equivalent to the services performed is speculative at best.

---

[9] Even the trial court acknowledged that "plaintiffs have not met Exxon's assertion that the gas price was 'smack dab in the middle.' "

Plaintiffs' claims for tortious interference and breach of covenant must be tied to finding an anticompetitive practice, even if not a statutory antitrust violation. In *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at page 393, the Supreme Court held that in actions for interference with prospective economic advantage, as applied to existing contracts, a plaintiff must show that interference was wrongful by some measure beyond the interference itself. Moreover, Exxon in fact has a clear financial interest in its dealers and therefore is privileged to "interfere" with the contract.[10] (*Hamro* v. *Shell Oil Co.* (9th Cir. 1982) 674 F.2d 784.)

IV

*Breach of Contract*

 ▄▄ ▄▄ Plaintiffs alleged that Exxon had no right to withdraw its Exxon credit card from the California market.[11] Exxon attacked that claim on the basis that it varies the express language of the parties' integrated agreement which gives Exxon the right to cancel the credit card at any time. The relevant contract provision states: "Exxon may, for any reason, upon written notice, terminate this Agreement [pertaining to its credit card] and discontinue the purchase or acceptance of Credit Sales Tickets from any Retailer or Distributor." Plaintiffs' claim violates the express language of the contract, and thus it cannot stand. An implied covenant cannot create an obligation inconsistent with an express term of the agreement. (See *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710]; see also *Slivinsky* v. *Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 806-807 [270 Cal.Rptr. 585].)

Similarly, we conclude the relevant contract language is inconsistent with plaintiffs' allegation that Exxon made collateral promises to repair or re-model certain stations. The lease is an integrated agreement, and it provides in relevant parts: Under the heading of "Repairs and Additional Facilities," the lease states that lessor shall make repairs and replacements as provided

---

[10]Plaintiffs complain that their contract with Exxon specifies they are "independent" dealers. However, under the sales agreement complained of here, plaintiffs and Exxon have contracted for gasoline sold and supplied. A separate lease agreement contains a paragraph setting forth the dealers' independent status for purposes of third party liability.

[11]Plaintiffs argue that a summary adjudication of this point does not dispose of an entire cause of action and is therefore not a proper subject of summary adjudication under the new statute. (Code Civ. Proc., § 437c, subd. (f)(1).) However, plaintiffs pleaded their case by combining causes of action. Exxon remains entitled to present summary adjudication motions that dispose of allegations which would have formed a single cause of action if properly pleaded. (See *Lilienthal & Fowler* v. *Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855 [16 Cal.Rptr.2d 458].)

in an attached exhibit if lessee promptly notifies lessor in writing that there is need and lessor determines that such repairs are economically justified, and lessor shall be "absolutely exempt" from making any other repair, renewal, or replacement. The lease further states that lessee shall at its own expense make all other repairs, renewals and replacements, and that lessor at its option has the "right but not the obligation" to demolish, rebuild, reconstruct, remodel, modernize, change, eliminate, replace, or make additions to the premises. This provision clearly allocates the decision to Exxon alone. Moreover, plaintiffs have pointed to no concrete evidence of specific agreements to repair or remodel. Summary adjudication was warranted.

DISPOSITION

Let a peremptory writ of mandate issue as prayed, directing the respondent court to vacate its order denying summary adjudication to Exxon, and to make new and different orders granting the motions for summary adjudication as to the following claims: second cause of action (Cartwright Act—vertical restraint); third cause of action (Cartwright Act—monopolization); sixth and seventh causes of action (fraud and negligent misrepresentation—price), including any claims of gasoline price overcharging; those parts of the fourth and eleventh causes of actions alleging tortious interference with economic opportunity and breach of the covenant of good faith and fair dealing; and those parts of the tenth cause of action for breach of contract concerning any claims arising out of the discontinuation of acceptance of the Exxon credit card and arising out of oral promises to remodel stations. Costs to petitioner.

Elia, J., concurred.

**PREMO, Acting P. J.**—I respectfully dissent. My concern is that even if the argument put forth by Exxon, as adopted by the majority, ultimately is persuasive and carries the day, it is premature for us to draw conclusions as a matter of law at this point in the case.

My colleagues state the dispositive conclusion that the relevant market in this case is the overall retail gasoline market and not the Exxon gasoline stocks which are purportedly the subject of vertical restraints. The majority does so because of what they perceive to be unassailable case law in support of petitioner's argument. As a result the relevant market decision is herein made as a matter of law. We therefore disagree with the trial court who felt a triable question of fact was entailed.

Again, I stress my concern is the timing of these conclusions. The majority may well have stated the correct ultimate outcome. Certainly there

is a trend in the decided cases that would so indicate. But to do so in a case which at best is complex and somewhat arcane, which requires the distinguishing of *Redwood Theatres, Inc.* v. *Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687 [248 Cal.Rptr. 189] and *Eastman Kodak Co.* v. *Image Technical Services, Inc.* (1992) 504 U.S. 451 [119 L.Ed.2d 265, 112 S.Ct. 2072], and which entails weighing and disregarding the proffered testimony of respondent's primary expert witness is, in my opinion, a bit of a quantum leap.

Even had these arguments been subjected to an evidentiary hearing or trial itself where the parties' entrenched positions could be illuminated or worse, exposed as unpersuasive, in the light of cross-examination this court would at least have a complete record upon which to base the comprehensive conclusions of the majority opinion.

Without such a record, I believe this case does not merit our intervention at this stage. We should deny the petition.

A petition for a rehearing was denied February 13, 1997, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied May 14, 1997. Mosk, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.