Filed 7/22/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BEN-E-LECT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY et al.,<br><br>　　　Defendants and Appellants. | A152080<br><br>(Sonoma County<br>Super. Ct. No. SCV-256990)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on July 2, 2020, be modified as follows:

1. On page 3, in the first full paragraph, in the sentence that starts with "Beginning in 2006," the term "heath plans" is changed to "health plans."

2. On page 9, at the end of the first paragraph (which continues from page 8), the following sentence and new footnote 2 are added:

> When considering only preferred provider organization (PPO) health plans, Anthem has approximately 47 percent of the California market.[2]

---

[2] PPO plans and health maintenance organization (HMO) plans are two different types of health coverage. Kaiser is an HMO available in California's major metropolitan

3. On page 10, the first two full sentences, beginning with "Here, Ben-E-Lect showed that Anthem is a major participant" and ending with "in the California small group health insurance market," are deleted and replaced with the following two sentences:

> Here, Ben-E-Lect showed that Anthem is a major participant, if not the dominant participant, in the market of providers for small group PPO health insurance plans throughout the Central Valley, Northern California, the California coast from Monterey to Ventura, the Inland Empire, the Coachella Valley and along the I-15 corridor from San Bernardino to San Diego. Anthem has market power in the California small group PPO health insurance market.

4. On page 13, at the end of the first paragraph (which continues from page 12), the following new footnote 3 is added, as follows:

> Instead, they are evidence of the disruption of ongoing relationships its competitor Ben-E-Lect established in a pattern of sales with its brokers and agents over the years.[3]

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Dated:     July 22, 2020          SIGGINS, P.J.          , P. J.

---

areas. The areas of California where Anthem is the dominant provider are areas where Kaiser does not have facilities, and coverage is obtained primarily through the PPO market.

[3] The trial court also considered the coercive effect of the Anthem prohibition on wrapping to be further evidence of its market power.

2

<u>A152080/Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co.</u>

Trial Court:   Superior Court of the County of Sonoma

Trial Judge:   René Auguste Chouteau, J.

Counsel:    Morgan, Lewis & Bockius, Thomas M. Peterson, Molly Moriarty Lane and Michelle Park Chiu for Defendants and Appellants.

       Law Offices of Michael Brook and Michael J. M. Brook for Plaintiff and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BEN-E-LECT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY et al.,<br><br>        Defendants and Appellants. | A152080<br><br>(Sonoma County<br>Super. Ct. No. SCV-256990) |

Defendants, Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California (collectively Anthem), appeal from a judgment following a court trial that held them liable to plaintiff Ben-E-Lect for violating the Cartwright Act and intentionally interfering with Ben-E-Lect's prospective economic relations. Anthem challenges the finding of Cartwright Act liability on several grounds, primarily the trial court's determinations that it held sufficient market power or caused any antitrust injury. Anthem challenges the tort liability, arguing there was no evidence Ben-E-Lect had economic relationships with third parties entitled to legal protection.

We affirm. The trial court considered sufficient evidence of market power in concluding under the rule of reason that Anthem's conduct in coercing a boycott of Ben-E-Lect's services harmed Ben-E-Lect and violated the Cartwright Act. Anthem's conduct also caused a market injury of the type the antitrust laws were designed to address. The damages are rooted in

1

the evidence of harm caused to Ben-E-Lect by the Anthem boycott and are properly awarded for Anthem's conduct.

## BACKGROUND

Ben-E-Lect is a third party insurance claim administrator that developed a medical expense reimbursement plan. Under the Ben-E-Lect plan, employers could buy a group policy of medical insurance with a high deductible and self-fund to pay for the healthcare expenses employees incurred within the annual deductible or any copay requirement. Ben-E-Lect worked with its employer clients to set up medical expense reimbursement plans (MERP) or health expense reimbursement accounts (HRA) that would allow employers to control their costs by designing an employer's share of the employee deductible and copay expenditures. This arrangement allowed employers to buy high-deductible and less expensive health plans and save on health insurance premiums. Ben-E-Lect provides employers the administrative support necessary to manage the plan, and Ben-E-Lect clients were able to reduce their costs and improve the benefits available to their employees.

The practice of employers' using MERPs and HRAs in conjunction with a high-deductible health plan in order to minimize employee costs is commonly known as "wrapping." Ben-E-Lect's wrapping services were sold through insurance brokers and agents who sold health plans to the small group employer market. In 2006 and 2007, Ben-E-Lect usually had between 550 and 580 insurance brokers receiving commissions for selling its wrapping services. More than 1,500 brokers have received commissions over the span of Ben-E-Lect's existence, and at the time of trial 475 brokers were receiving commissions. The definition of the small group market refers to employers with anywhere from 2 to 100 employees based upon the time period covered

2

by the insurance policy in question. Before 2017 a small group was understood to mean fewer than 51 employees, and after 2017, in accord with the Affordable Care Act, the small group market refers to groups of up to 100 employees. Ben-E-Lect was the state's largest third party administrator for small group employers who wrapped their employee medical policies.

Anthem provides fully insured health plans to the California small group employer market. Under a fully insured health plan, an employer pays a set premium and Anthem pays all the expenses incurred for healthcare under the terms of the plan irrespective of the rate of utilization of the plan by the covered employees. Beginning in 2006, Anthem announced a policy to prohibit the use of an HRA, MERP or wrap with all of its heath plans, except for its exclusive provider organization (EPO). Under the EPO plan, benefits were payable only for medical services provided by an exclusive network of care providers. In 2011, Anthem revised its policy to permit wrapping only with its EPO and its high-deductible Elements plans. The Elements plans were designed to cover major medical events, such as hospitalization, but did not provide benefits for routine care or prescriptions. Then in 2014, Anthem prohibited wrapping all Anthem plans.

Anthem's prohibition against wrapping was communicated to employer groups and Anthem's sales agents in a statement of understanding (SOU). Employer groups who used Anthem plans certified they would not wrap Anthem policies, and the agents certified they would not advise the employer to enter into any employer-sponsored wrapping plan. Anthem's agents also certified that any misrepresentations or omissions made by them in the SOU may cause them to lose their commissions and their relationship with Anthem could be terminated.

In 2015, Ben-E-Lect sued Anthem over its policy to prohibit wrapping of its health insurance products. The complaint asserted causes of action for violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), intentional interference with business relations and negligent interference with business relations. Ben-E-Lect sought damages for lost sales occurring from 2011 to 2014 and injunctive relief. The case was tried to the court.

The court determined that Anthem's policy to prohibit wrapping its health insurance products violated the Cartwright Act and interfered with Ben-E-Lect's prospective business relationships. Anthem's prohibition on wrapping was found to be an illegal, coercive, vertical group boycott under the rule of reason, because Anthem told its insurance agents that if they wrapped any Anthem policies they would be subject to termination as Anthem agents and lose their sales commissions. The court awarded damages of $2.46 million, trebled under the Cartwright Act for a total damages award of $7.38 million. (Bus. & Prof. Code, § 16750, subd. (a).) The court also enjoined Anthem from implementing its prohibition against wrapping health insurance products offered to the California small group market.

Anthem appeals the judgment.

**DISCUSSION**

**1. The Cartwright Act.**

The Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) is our state's principal antitrust law. "At its heart [it prohibits] agreements that prevent the growth of healthy, competitive markets for goods and services and the establishment of prices through market forces." (*In re Cipro Cases I & II* (2015) 61 Cal.4th 116, 136.) The act prohibits all combinations created for or

4

carrying out unreasonable restrictions in trade or commerce. (*Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 492–493.) Historically, some combinations, such as agreements to fix prices, divide markets, or tie the purchase of one product or service to another, as well as certain boycotts, have been considered unreasonable per se and, therefore, illegal. (*Oakland-Alameda County Builders' Exchange v. F. P. Lathrop Construction Co.* (1971) 4 Cal.3d 354, 361; *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 930–931.) But the modern approach is more nuanced. (See *In re Cipro Cases I & II*, at p. 147.)

Now, the per se approach is viewed side by side with traditional rule of reason analysis that considers whether a given combination promotes or harms competition. (*In re Cipro Cases I & II*, *supra*, 61 Cal.4th at pp. 146–147.) "To determine whether an agreement harms competition more than it helps, a court may consider 'the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption.' [Citations.] In a typical case, this may entail expert testimony on such matters as the definition of the relevant market [citation] and the extent of a defendant's market power [citations]." (*Id.* at p. 146.) This analytic approach involves "a continuum, with the 'circumstances, details and logic' of a particular restraint [citation] dictating how the courts that confront the restraint should analyze it." (*Id.* at p. 147.)

Here, the claim is that Anthem's directive to its brokers and agents that forbids wrapping Anthem health policies amounts to a vertical boycott. It was alleged this directive was intended to exclude Ben-E-Lect and its clients from the market for Anthem health insurance products. "A 'vertical boycott' occurs when 'entities at different levels of distribution combine to

5

deny a competitor at one level the benefits enjoyed by members of the vertical combination.' [Citations.]" (*Marsh v. Anesthesia Services Medical Group, Inc.*, *supra*, 200 Cal.App.4th at p. 494.) Rule of reason analysis applies to determine whether a vertical boycott unreasonably restrains competition. (*Ibid.*) The elements of a Cartwright Act claim are: the formation and operation of a combination or conspiracy in restraint of trade; wrongful acts done in furtherance of the combination; and resulting damage. (*Id.* at p. 493.)

In a rule of reason case it is the plaintiff's burden to show that the challenged vertical restraint had a substantially adverse effect on competition in the relevant market, and thereby harms competition more than promotes it. (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680–1681.) Ordinarily, this will require the plaintiff to show the defendant has market power, i.e., " 'that the defendant plays enough of a role in the [relevant market] to impair competition significantly.' " (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 542.) " 'As a practical matter, market power is usually equated with market share.' " (*Ibid.*) Whether a restraint of trade is reasonable is a question of fact to be determined at trial. (*Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 855.) "[O]n appeal, this court is bound by the substantial evidence rule, and every intendment or presumption must be indulged in favor of the judgment." (*Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 718.)

## 2. Ben-E-Lect Cartwright Act Claim.

### a. Anthem's Restraint of Trade Proven Under the Cartwright Act.

Anthem contests virtually every finding of fact or legal conclusion made by the trial court regarding whether its ban on wrapping constitutes an unreasonable economic restraint. But several aspects of the court's findings

6

are clearly rooted in the evidence. First of all, we have no reason to vacate the finding that Anthem and Ben-E-Lect are competitors. The evidence was plain that Ben-E-Lect provided services to Anthem plan holders. Ben-E-Lect clients were able to subscribe to less expensive Anthem plans because of Ben-E-Lect's wrapping services. In this way, Ben-E-Lect competes with Anthem for small group health insurance clients. Rather than subscribe to a fully insured plan, an employer could subscribe to an alternative, less expensive Anthem plan with a higher deductible and use the saving in premiums, which would otherwise be paid to Anthem, to pay Ben-E-Lect.

We also have no reason to doubt the court's conclusion that the Anthem policy facilitated a vertical group boycott with Anthem brokers and agents. Anthem argues that, as a matter of law, it could not "conspire" with its own agents. Anthem says that because insurance agents are statutorily classified as authorized to represent insurers, there is no combination here in restraint of trade. Anthem argues the brokers were not independent economic actors, so there could be no conspiracy or combination. Essentially, its argument is that a corporation cannot conspire with itself or its controlled entities. The trial court rejected the argument, and so do we.

While Anthem is correct to argue that an agreement or conspiracy to violate the antitrust laws must be among actors with separate economic interests (see *Kolling v. Dow Jones & Co.*, *supra*, 137 Cal.App.3d at p. 720), it goes too far when it says that insurance agents or brokers selling Anthem products are not independent actors. The evidence at trial showed that brokers and agents may and do sell plans offered by different insurers. Brokers also work on behalf of their clients to try and sell them the least expensive health benefits solution suitable for their employees. They are not exclusive agents of Anthem, and their economic interests are separate. The

7

relationship between Anthem and its broker agents most closely resembles the producer–distributor relationship that supported an agreement to violate the Cartwright Act in *Kolling v. Dow Jones & Co., supra*, 137 Cal.App.3d at p. 720. Anthem and its broker agents could agree or act in concert to violate the Cartwright Act.

Ben-E-Lect had relationships with approximately 475 California insurance brokers who sold or would sell its services on Anthem health plans if there were no policy against wrapping Anthem products. Anthem was aware of Ben-E-Lect's business model, and beginning in 2001, Ben-E-Lect's principal had discussions about wrapping Anthem plans with its representatives. Ben-E-Lect thus had ongoing relationships with insurance brokers that would inure to its economic benefit if they were allowed to sell Ben-E-Lect services to Anthem subscribers, and Anthem was aware of Ben-E-Lect's desire to sell wrapping services for its health plans.

### b. *The Geographic and Product Market and Anthem's Market Power.*

Anthem argues it could not be held liable under the Cartwright Act because Ben-E-Lect failed to prove it had sufficient market power in two respects: It asserts that Ben-E-Lect did not prove the relevant geographic market and that it did not demonstrate Anthem had sufficient power in the relevant market to charge prices higher than the competitive level. But the evidence was sufficient to show that Anthem has sufficient market power in a defined market for small group employer health plans in California.

Anthem had about 25 percent of the overall California market.[1] But, the availability of health insurance plans in California varies county by

---

[1] One chart in evidence showed that in 2011, the beginning of the damages period in this case, Anthem had a 29.7-percent share of the California market. Kaiser had 28 percent of the market with Blue Shield at

county. In some areas, Anthem's market share was estimated to be much higher. Anthem was the dominant health insurance provider to the small group market in inland Northern California, north of Santa Rosa across to Sacramento; through the Central Valley; the Inland Empire; the Coachella Valley; and along Interstate 15 from San Bernardino to San Diego. Along the central coast from Ventura to Monterey, Anthem was estimated to control 80 percent of the health insurance market. It also has the state's largest network of physicians.

Moreover, the ability to raise prices above competitive levels may be relevant in a case involving a monopoly or conspiracy to fix prices (e.g., *In re Cipro Cases I & II, supra,* 61 Cal.4th at p. 157), but here we are dealing with a vertical boycott. In a vertical restraint case, the inquiry is whether the defendant plays enough of a role in the relevant market to significantly impair competition. (*Exxon Corp. v. Superior Court, supra,* 51 Cal.App.4th at p. 1682.) To show this, typically a plaintiff " 'must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.' " (*Roth v. Rhodes, supra,* 25 Cal.App.4th at p. 542.) The ability to raise prices above a competitive level is an example of market power but does not define it. (See *In re Cipro Cases I & II, supra,* 61 Cal.4th at p. 148 [monopoly power is " 'the power to control prices or exclude competition' "]; *Exxon Corp. v. Superior Court, supra,* 51 Cal.App.4th at p. 1681–1682; *Roth v. Rhodes, supra,* 25 Cal.App.4th at p. 542; *Redwood Theatres, Inc. v. Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687, 703–704 [power to raise price significantly above the competitive level without

12 percent, United Health at 8 percent, Aetna at 7 percent, Health Net at 6 percent, CIGNA at 4 percent and other companies making up the remaining 5 percent of the California market.

9

losing all of one's business].)  Here, Ben-E-Lect showed that Anthem is a major participant, if not the dominant participant, in the market of providers for small group health insurance plans throughout the Central Valley, Northern California, the California coast from Monterey to Ventura, the Inland Empire, the Coachella Valley and along the I-15 corridor from San Bernardino to San Diego.  Anthem has market power in the California small group health insurance market.

### c. *Antitrust Injury.*

There is no question that Anthem's prohibition against wrapping its insurance products harmed Ben-E-Lect.  The evidence showed that Anthem's expert calculated Ben-E-Lect's lost profits to be between approximately $400,000 and $3 million as a result of Anthem's policy.  But injury to a competitor is not the same thing as injury to competition.  (*Asahi Kasei Pharma Corp v. CoTherix, Inc.* (2012) 204 Cal.App.4th 1, 20.)  The Cartwright Act protects against injury to competition.  (*Ibid.*)  "[T]he antitrust injury requirement means that an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects."  (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2011) 198 Cal.App.4th 1366, 1380.)  While an injured competitor need not show that the market has actually become less competitive, to prove an illegal vertical restraint the conduct must be of the type that harms competition and is done for an anticompetitive purpose.  (*Exxon Corp. v. Superior Court*, *supra*, 51 Cal.App.4th at p. 1682.)  Here, the anticompetitive aspects of Anthem's conduct outweigh its procompetitive aspects (see *ibid.* at p. 1681) for the following reasons.

10

The evidence showed that beginning in 2006 Anthem intentionally prohibited the sale of wrapping services on certain of its health plans and expanded that prohibition to all of its plans beginning in 2014. Anthem implemented its prohibition on wrapping because it said wrapping increases utilization of a health plan. An increase in utilization means that the use of healthcare services by individuals covered by the plan requires the plan provider to spend more money on healthcare than it anticipates when it sets premiums for the plan. But the trial court found Anthem's prohibition was an unreasonable restraint because Anthem based its decision on generalized statistical projections and not on an actual analysis of Anthem's experience. The evidence supports the trial court's conclusion.

Anthem never conducted its own study to determine whether wrapping increases utilization of its health plans. Instead, it relied principally on what are known as the Milliman guidelines, which were described as a set of foundational principles and factors that are used to project trends in utilization when pricing plans. Health plans are priced so that 80 cents of each dollar received in premiums is expended on care. If the benefit design is modified as a result of wrapping or some other factor that increases utilization, the amount expended on care increases but is not offset by an increase in price. Such a situation becomes unsustainable when prices must be raised to noncompetitive levels in order to take into account increased utilization brought about by wrapping. But nothing in the record shows that Anthem ever tested its experience against the Milliman guidelines to determine whether reliance on the Milliman projections to set rates was warranted.

The problem with Anthem's reliance on the Milliman guidelines and general statistical observances is that its conclusions were contradicted by

11

the evidence. Ben-E-Lect's records showed that less than 5 percent of its plan members would present claims that exceeded the deductible required to be paid by a member of a high-deductible Anthem plan. So, 95 percent of its plan members, who do not exceed their deductible, do not appear to have any effect on plan utilization rates. One of Ben-E-Lect's competitors, which employed approximately 18 people, testified that in 13 years it never had one of its employees exceed the deductible amount of his or her Anthem plan. An actuary who designed pricing for a high-deductible health plan other than Anthem's, and who took into account the possibility of wrapping when he priced the plan, testified that even with wrapping, the plan was more profitable than projected. This evidence supports the trial court's conclusion that Anthem's ban on wrapping was an unreasonable and unwarranted restraint of trade. Whether a restraint of trade is reasonable is a question of fact to be determined at trial. (*Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, *supra*, 4 Cal.3d at p. 855.)

Anthem's prohibition on wrapping also disrupted the relationships Ben-E-Lect had with the insurance brokers and agents selling its products. One agent who served the Central Valley of California, from Sacramento to Los Angeles, testified that before 2006 she had 80 employer groups using wrapping services, but once Anthem implemented its prohibition on wrapping the number dropped to two. A broker from the Southern California Inland Empire testified that about 80 percent of his clients were Anthem subscribers prior to 2011, and following the prohibition on wrapping about 50 percent of his clients used a Ben-E-Lect HRA. If Anthem had no restriction on wrapping, he would have sold more Ben-E-Lect services. An agent from Orange County testified that he lost 8 to 10 group employer clients because he could not wrap Anthem plans with a Ben-E-Lect HRA. The principal of

12

Ben-E-Lect stated that approximately 75 to 80 percent of his plan cancellations from 2008 to 2014 were due to the Anthem prohibition on wrapping. Between 2006 and the time of trial in this case, the number of brokers receiving commissions from Ben-E-Lect dropped from between 550 and 580 to 475. These are not speculative sales opportunities as Anthem suggests. Instead, they are evidence of the disruption of ongoing relationships its competitor Ben-E-Lect established in a pattern of sales with its brokers and agents over the years.

Anthem argues that the relationships Ben-E-Lect has with its agents and brokers are irrelevant. It argues that Ben-E-Lect was required to show a disruption in its relationships with employers who purchased health plans. This contention ignores the reality that Ben-E-Lect relied on insurance agents and brokers to procure its customers. Its services were sold primarily through these intermediaries, and when they were prohibited from doing so, Ben-E-Lect was harmed. So, too, were the consumers who relied upon their brokers and Ben-E-Lect to provide them a less expensive option for employee health benefits.

"Antitrust laws are designed primarily to aid the consumer. They rest 'on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.' [Citation.]

"Another beneficiary of antitrust law is the competitor himself. The preservation of competition, while indirectly aiding society by producing lower prices and higher quality goods and services, directly aids the scrupulous trader by insuring [*sic*] him a fair opportunity to compete on the

13

market.  An anticompetitive practice 'is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy.' " (*Marin County Bd. of Realtors, Inc. v. Palsson*, *supra*, 16 Cal.3d at p. 935, citing *Klor's v. Broadway-Hale Stores* (1959) 359 U.S. 207, 213; accord, *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, *supra*, 198 Cal.App.4th at pp. 1379–1380.)  The record supports the trial court's conclusion that the anticompetitive effect of Anthem's conduct outweighed its procompetitive purpose.  Ben-E-Lect suffered antitrust injury.

### d. Damages.

Finally, as a result of the Anthem policy and the harm it caused, Ben-E-Lect lost profits.  In assessing damages, the trial court used the analysis of Ben-E-Lect sales performed by Anthem's expert witness on damages calculation.  Anthem's expert agreed with Ben-E-Lect's calculation that it had 500 agents selling Anthem products.  But while Ben-E-Lect projected each of the agents would sell one plan per year, the Anthem expert thought that assumption was unrealistic and instead projected that each of them would sell half of a plan per year.  Anthem's expert also determined that each employer would remain a Ben-E-Lect customer for 3.5 years and not the 5 years projected by Ben-E-Lect.  Each of those customer relationships would yield Ben-E-Lect $1,800 a year in commissions.  The Anthem expert also estimated Ben-E-Lect's incremental return of profit could range between 4.4 percent and 24.9 percent of sales.  After taking into account a discount rate and prejudgment interest for lost sales beginning in 2011 and running through 2014, the Anthem expert estimated lost profits in the range of $430,000 at the low end to a high of $3.15 million.  The trial

court awarded damages for lost profits of $2.46 million based upon the Anthem expert's analysis with an incremental return of profit of 24.9 percent.

Anthem's damages expert also opined that Anthem's policy caused Ben-E-Lect no injury at all because it was not generating enough profit at the beginning of the damages period to be a viable business and had to rely on infusions of capital to stay open. Like the trial court, we do not give credence to this contention. Ben-E-Lect was an operating business at the time of trial, and although the expert pointed to other economic factors that contributed to Ben-E-Lect's deteriorating financial condition, the evidence showed it was harmed by Anthem's prohibition on wrapping.

The judgment for $2.46 million in lost profits was trebled by the trial court under California Business and Professions Code section 16750, subdivision (a) in light of Ben-E-Lect's recovery under the Cartwright Act, for a total award of $7.38 million dollars. In light of our affirmance of recovery under the Cartwright Act, we also affirm Ben-E-Lect's recovery for intentional interference with prospective economic relations.

## DISPOSITION

The judgment in favor of Ben-E-Lect and against Anthem on claims brought under the Cartwright Act, for intentional interference with prospective economic relations, and for injunctive relief based on the Cartwright Act violations is affirmed. Ben-E-Lect is awarded its costs on appeal.

15

_____
Siggins, P. J.


WE CONCUR:


_____
Petrou, J.


_____
Jackson, J.


A152080/*Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co.*

Trial Court:   Superior Court of the County of Sonoma

Trial Judge:   René Auguste Chouteau, J.

Counsel:    Morgan, Lewis & Bockius, Thomas M. Peterson, Molly Moriarty Lane and Michelle Park Chiu for Defendants and Appellants.

       Law Offices of Michael Brook and Michael J. M. Brook for Plaintiff and Respondent.