[No. B189889. Second Dist., Div. Two. June 26, 2007.]

VINCENT SALAZAR, Plaintiff and Appellant, v.
INTERLAND, INC., et al., Defendants and Respondents.

## COUNSEL

Law Offices of James Aaron Pflaster, Martin R. Berman and James Aaron Pflaster for Plaintiff and Appellant.

Jones Day, Brian A. Sun, John S. Sasaki; Wargo & French, Joseph D. Wargo, Michael S. French; Graves Law Office and Phillip J. Graves for Defendants and Respondents.

## OPINION

**DOI TODD, J.**—We affirm summary judgment in favor of respondents on appellant Vincent Salazar's claim for commissions on the transfer of Internet and Web-hosting services to respondents from AT&T Corp. The trial court correctly found that the transaction was the sale of a business opportunity and that under Business and Professions Code section 10131, subdivision (a),

Salazar was required to be licensed as a broker in order to recover compensation for arranging the sale or acquisition of this business.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint*

Salazar, individually and doing business as Los Angeles Technology, sued respondents HostPro, Inc. (HostPro), and Interland, Inc. (Interland), for breach of contract and fraud. He alleged that he was an agent of AT&T Corp. (AT&T) authorized to market Internet and Web-hosting services to small and medium-sized businesses (the Web services). In 2001, he advised HostPro, which also provided Web services to small and medium businesses, that AT&T no longer wished to provide these Web services. HostPro expressed an interest in acquiring AT&T's small and medium business clients.

On February 13, 2001, Salazar entered into a written contract with HostPro to market HostPro's Web services to small and medium business customers and to arrange the acquisition of AT&T's small and medium business customers. HostPro represented to Salazar that he would receive a 10 percent commission on all monthly recurring fees received by HostPro up to $10,000, a 20 percent commission on monthly recurring fees over $10,000 and a 5 percent commission payment as a one-time setup fee for each customer acquired due to his efforts.

Based on the contract and representations, Salazar initiated and participated in meetings between HostPro and AT&T. HostPro merged its operations with Interland, which later acquired approximately 150,000 AT&T customers. Interland refused to pay Salazar his commission on the monthly recurring fees and his setup fees for the acquired AT&T customers. Salazar sued for damages in excess of $20 million.

*Prior Federal Court Proceedings*

Salazar originally filed a complaint in 2004 in federal district court, which was dismissed for lack of subject matter jurisdiction. Salazar refiled the complaint in Los Angeles Superior Court, but that case was removed to federal court based on diversity of citizenship. In support of its removal, Interland, a Minnesota corporation, and HostPro, originally a California corporation, represented that "[d]efendant . . . HostPro has no existence separate or apart from Defendant Interland." The district court eventually

granted Interland's summary judgment motion as to the fraud but not the breach of contract cause of action. In March 2005, Interland again represented that Interland and HostPro were not separate entities. But after further briefing, the district court ruled that HostPro did have a separate corporate identity and had its principal place of business in Los Angeles, obviating diversity jurisdiction and requiring remand to the superior court.

*Superior Court Proceedings*

Upon remand, the parties briefed the issue of the effect in superior court of the prior federal court proceedings. In its briefing, Interland argued for the first time that Salazar could not recover under his contract because his lack of a business opportunity license rendered his contract for commissions illegal.

The trial court ruled that the district court's rulings on the previous summary judgment motions were void and ordered a further hearing on those motions based on the pleadings filed in federal court. The court granted leave to Interland to file an additional motion for summary judgment on the illegality issue. After a hearing, the trial court adopted as its own the order of the federal court granting summary judgment on the fraud claim and denying it as to the breach of contract claim. Later, the court granted summary adjudication on the breach of contract claim based on Salazar's lack of a broker's license. The minute order stated "After the subject transaction was completed, AT&T retained no assets, in the form of customer contracts, equipment, or otherwise, to continue with its small and medium sized Web-hosting business. The court finds that the subject transaction constitutes a sale of a 'business opportunity' . . . ." The court entered judgment in favor of respondents from which Salazar has appealed.

## DISCUSSION

### I. *Contentions on Appeal and Standard of Review*

Salazar contends that the trial court erred in finding that the transaction between Interland and AT&T constituted the purchase and sale of a "business opportunity" under Business and Professions Code section 10131, subdivision (a)[1] that required him to be licensed in order to recover under his contract. Specifically, Salazar argues that only a small portion of AT&T's

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

assets were sold here and the decision in *All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723 [259 Cal.Rptr. 780] (*All Points*) requires the sale of all of the assets or stock of a corporation in order to constitute the sale of a "business opportunity." Salazar also challenges the order signed by the court on the grounds that it contains facts that were disputed.

We review the trial court's decision in granting summary judgment de novo. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65 [99 Cal.Rptr.2d 316, 5 P.3d 874].) In exercising de novo review, we "must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom ([Code Civ. Proc.,] § 437c, subd. (c)), and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

## II. *Salazar Was Required to Have a Business Opportunity License*

### A. *Business Opportunity License*

In 1965, the Legislature merged the statute requiring a person acting as a business opportunity broker to be licensed with the section requiring a real estate broker to be licensed. (See *All Points, supra*, 211 Cal.App.3d at p. 728.) As a result, the definition of "real estate broker" in section 10131, subdivision (a) was expanded to include "a person who, for a compensation or in expectation of a compensation . . . does or negotiates to do one or more of the following acts for another or others: [¶] (a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of . . . a business opportunity." Section 10130 requires a real estate broker to have a license. Sections 10130 and 10136 prohibit an unlicensed real estate broker from collecting compensation earned in the capacity of a broker. (*All Points, supra*, at p. 729.) To be licensed, a broker must meet training and experience qualifications. (§§ 10150.6, 10153.) "The purpose of these licensing requirements is to protect the public from incompetent or untrustworthy practitioners. [Citation.]" (*All Points, supra*, at p. 729.)

### B. *Definition of "Business Opportunity"*

"Business opportunity" is defined as including "the sale or lease of the business and goodwill of an existing business enterprise or opportunity." (§ 10030.)

Salazar argues that the transaction between Interland and AT&T did not constitute a business opportunity because it did not involve the purchase and sale of *all* of the assets of AT&T, or one of its subsidiaries or divisions. He relies on a holding in *All Points* that "the sale or purchase of a 'business opportunity' encompasses any transfer of the ownership of an entire ongoing business in corporate form whether by transfer of all the stock or all the assets." (*All Points, supra*, 211 Cal.App.3d at p. 731.) But Salazar's reliance on *All Points* is misplaced because that case did not consider whether the transfer of less than all of a corporation's stock or assets can constitute the sale of a business opportunity. (See *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["an opinion is not authority for a proposition not therein considered"].)

The issue analyzed in *All Points* was whether the licensing requirements of section 10131 applied to the sale of corporate stock, because a transfer of stock does not typically include a "vendible interest in the goodwill of the business carried on by the corporation." (*All Points, supra*, 211 Cal.App.3d at p. 732.) It was argued that a stock transaction could not also be the sale of a business opportunity. (*Ibid.*) But because all of the corporate stock was transferred in that case, the sale unquestionably also included "a transfer of the goodwill of the business, affecting the purchase price." (*Ibid.*) "[T]he purchaser of the corporation not only acquired the 'business' but the 'goodwill' as well." (*Ibid.*) The *All Points* court held that the transfer of all of the corporate stock constituted the transfer of the business and a license was required to broker such a sale. But we do not read *All Points* as requiring the transfer of all of the shares or assets of a corporation, or of one of its subsidiaries or divisions, in order for a transaction to have constituted the sale of a business opportunity.

█ Although "business opportunity" under section 10030 includes the sale of an existing busines enterprise, there is no requirement there is no requirement that the sale include every business in which a corporation is engaged. Moreover, by using the term "include" the definition is not necessarily limited to the inclusions. (*People v. Arnold* (2006) 145 Cal.App.4th 1408, 1414 [52 Cal.Rptr.3d 545], citing *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774 [117 Cal.Rptr.2d 574, 41 P.3d 575].) The plain language of the statute, therefore, does not support Salazar's contention that nothing short of the transfer of all the stock or assets of AT&T, or of one of its subsidiaries or divisions, could constitute the sale of a business opportunity.

■ Nor are there any cases that support Salazar's position. Salazar acknowledges that the sale of a business has been defined as the sale of those assets essential to the continuation of a business. (*Shaw v. Hollister Land etc. Co.* (1913) 166 Cal. 257, 259 [135 P. 965] (*Shaw*).) In *Shaw*, a corporation in the business of conducting races could sell its sole asset, a racetrack, without shareholder approval because sale of that property did not prevent the corporation from conducting future races on other property, such as leased property.[2] (*Shaw, supra*, at pp. 260–261; accord, *Bradford v. Sunset Land etc. Co.* (1916) 30 Cal.App. 87 [157 P. 20]; *Estate of McCarthy* (1932) 127 Cal.App. 80 [15 P.2d 223]; *Piedmont Publishing Co. v. Rogers* (1961) 193 Cal.App.2d 171 [14 Cal.Rptr. 133].) Furthermore, the term "business" does not necessarily include all of the assets or property of an ongoing enterprise. (*Estate of Friedrichs* (1930) 107 Cal.App. 142, 144 [290 P. 54] ["[b]usiness is not a technical word and has no definite, popular or legal meaning"].) The question before us is not how many assets were sold but whether the business was capable of continuing after the sale.

■ The sale of a business opportunity includes the transfer of goodwill. (§ 10030.) "Goodwill" is defined as the "expectation of continued public patronage." (§ 14100.) " ' "[I]t is the probability that the old customers will resort to the old place. It is the probability that the business will continue in the future as in the past, adding to the profits of the concern and contributing to the means of meeting its engagements as they come in." ' [Citation.]" (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1098, fn. 6 [35 Cal.Rptr.3d 287].)

The transfer of a business opportunity as defined in section 10030 includes the transfer of those assets so essential that a business cannot continue without them and the transfer of future patronage or customers. As discussed below, we find undisputed proof of those attributes in the transaction between AT&T and Interland.

C.  *The AT&T/Interland Transaction*

The transaction between AT&T and Interland was detailed in the asset purchase agreement (Agreement) between the two companies. The Agreement described AT&T as "engaged, among other things, in the business of providing certain 'low-end' Web-hosting services known as AT&T Small Business

---

[2] Civil Code former section 361a required shareholder approval of any "conveyance of the business . . . as a whole, of any corporation . . . ."

Hosting Service (the 'Shared Service') and AT&T Business Ready Dedicated Hosting Service (the 'Dedicated Service'; together with the Shared Service, the 'Services') to certain of its business customers . . . ." The Agreement recited generally that the parties desired to sell and purchase "certain of the assets relating to the Services . . . ." The Agreement then delineated the specific assets transferred from AT&T to Interland, which included AT&T's customer contracts for the "Services," other enumerated contracts and license agreements applicable to the "Services" and "[a]ll of Seller's right, title and interest in and to all of the Dedicated Service Exclusive Equipment . . . ." "Dedicated Service Exclusive Equipment" was equipment owned by AT&T on the closing date used exclusively to conduct the dedicated "Services" as defined in the recitals. AT&T also agreed not to solicit the "Services" customers for six months. Interland, in turn, assumed all obligations under the customer contracts and paid AT&T more than $5 million for the transfer.

Salazar proffered no evidence that AT&T could or did continue offering the "Services" after it had transferred all of the equipment it used to conduct the "Services" and all of its customer contracts under which it had previously provided the "Services."[3] Instead, Salazar relied on a press release issued by Interland that did not mention the sale of units, divisions or the entire assets of AT&T. The press release stated that Interland "acquired the small business-focused shared and dedicated Web-hosting assets of AT&T . . . , relating to AT&T Small Business Hosting Service and Business Ready Dedicated Hosting Service." Interland described its own business as providing "business-class Web-hosting services to small and medium businesses . . . ." And AT&T stated that the sale "in no way diminishes the company's strong commitment to serving its small business customers in other market segments or the company's continued focus on hosting services for AT&T's mid-size and large business customers. . . ." The press release indicated that both parties to the transaction viewed the hosting of Web services for small and medium businesses as a separate business from hosting those services for larger businesses and as separate from other types of services for small and medium businesses. As such, the proffer of the release raised no issue of fact to support Salazar's position.

Salazar characterized the "Services" as a discrete business in his opposition to Interland's motion for summary judgment below. In his separate statement

---

[3] In his opposition to Interland's separate statement, Salazar objected to the copy of the Agreement proffered by Interland as lacking foundation. The record contains no ruling on his objection and it is, therefore, waived. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

of undisputed material facts he stated: "AT&T decided that the servicing of its small to medium Web-hosting customers was not part of its long term strategy. [¶] . . . AT&T was seeking to concentrate only on large enterprise customers. [¶] . . . [¶] Salazar . . . wanted to bring . . . to HostPro *the small to medium business Web-hosting business* that AT&T desired to no longer service." (Italics added.) Furthermore, Salazar characterized AT&T's small to medium business customers as a "business opportunity" for HostPro: "Salazar . . . began to consider ways that they could work with each other in order to create *new business opportunities.* [¶] . . . [¶] Salazar . . . began to arrange a meeting with his contacts at AT&T and HostPro's management, to discuss HostPro's acquisition of AT&T's small to medium Web-hosting customers as well as other potential *business opportunities.*" (Italics added.)

■ Given that AT&T, Interland and Salazar all characterize the transaction as the transfer of a business and a business opportunity, it is immaterial that the transaction involved less than 2 percent of AT&T's total base of its small business customers, or that AT&T continued to provide Web-hosting services to large clients, or that AT&T continued to provide other types of services to the small and medium clients. AT&T sold and Interland purchased the customer contracts, supporting equipment and pledge of nonsolicitation for six months that comprised AT&T's Web-hosting business for small to medium-sized clients. The undisputed evidence supports the conclusion that the transaction constituted the sale of a business opportunity.

III. *The Order Granting Summary Judgment*

Salazar argues that the order granting summary judgment impermissibly contained new facts and facts not supported by the record. We address each of Salazar's assignments of error in turn and find no prejudicial error with respect to the order.

Salazar objected to the court's finding that Interland acquired " '[a]ll of AT&T's contractual rights relating to its "Business Ready Dedicated Hosting Service" customers,' " because it was not contained in Interland's separate statement. But the contract was included in Interland's separate statement, and its terms were properly before the trial court. Among the assets listed as part of the sale were AT&T's "right, title and interest in the Customer contracts for the Services, to the extent such Customer contracts are applicable to the Services . . . and the other contracts and license agreements listed on Schedule 2.1, to the extent applicable to the Services . . . ." The

"Services" were defined as "AT&T Small Business Hosting Service" and "AT&T Business Ready Dedicated Hosting Service." The plain terms of the contract thus demonstrate that the customer contracts for the "Services" and other enumerated contracts and license agreements applicable to the "Services" were purchased by Interland, consistent with the trial court's factual finding.

Salazar also objected to the trial court's finding that " '[a]ll of the "Dedicated Service Exclusive Equipment" used to service these customers,' " was sold to Interland on the grounds that it was not set forth in Interland's separate statement. But that precise phrase was in the separate statement and the contract explicitly provides that Interland bought "[a]ll of Seller's right, title and interest in and to all of the Dedicated Service Exclusive Equipment . . . ."

Salazar objected to the finding that " '[a]s part of the Asset Purchase Agreement, AT&T further agreed not to solicit the customers that were transferred as part of the transaction for a specified period of time and stipulated that it had no plan to provide such services in the future,' " as not supported by the evidence. He is partially correct. While the six-month limitation on AT&T's solicitation of the transferred customers is contained in the separate statement and the contract, we have not found, nor has Interland identified, any evidence of an agreement as to future services. But even if that portion of the order is mistaken, Salazar has not demonstrated that the error undermines the conclusion that the transaction between Interland and AT&T constituted the sale of a business opportunity. (See *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163] [only prejudicial error requires reversal].)

■ Finally, Salazar argues that he was not seeking a commission for the transaction between Interland and AT&T but rather his share of the monthly fees paid by each customer as he is entitled to under his contract with Interland. But the statute prohibits "the collection of compensation" for acting as an unlicensed business opportunity broker regardless of how that compensation is characterized. (§ 10136; see also § 10131 [broker defined as one who "for a compensation or in expectation of a compensation, regardless of the form or time of payment . . . ."].)

We find no error in the form of the order granting summary judgment.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

Boren, P. J., and Chavez, J., concurred.

A petition for a rehearing was denied July 23, 2007.