[No. B199497. Second Dist., Div. Four. June 3, 2009.]

RANDY NEIN, Plaintiff and Appellant, v.
HOSTPRO, INC., et al., Defendants and Respondents.

Counsel

Randy Nein, in pro. per.; and John Jahrmarkt for Plaintiff and Appellant.

Graves Law Office, Philip J. Graves and Fredricka Ung for Defendants and Respondents.

Opinion

**SUZUKAWA, J.—**

## INTRODUCTION

Plaintiff Randy Nein was employed by defendants HostPro, Inc., and Interland, Inc. (collectively, defendant), as a salesperson between October 1999 and December 2001. In December 2000, plaintiff approached AT&T Corporation (AT&T) and suggested that defendant provide Web-hosting services to some of AT&T's business customers. Such a transaction was still being negotiated when defendant terminated plaintiff in December 2001, and it was consummated the following month.

Plaintiff seeks through the present action to recover commissions he claims are due him in connection with the AT&T transaction. The trial court granted summary judgment for defendant, concluding that the entire action is barred because plaintiff was not a licensed business opportunity broker. Additionally, the court found that plaintiff's termination cut off his right to any additional commissions under the plain language of plaintiff's written employment agreement.

We do not agree with the trial court that plaintiff's action is barred by his failure to procure a broker's license. In this regard, we reject defendant's claim that plaintiff is collaterally estopped by the Court of Appeal's opinion

in a related case from raising the broker's license issue. (*Salazar v. Interland, Inc.* (2007) 152 Cal.App.4th 1031, 1033–1034 [62 Cal.Rptr.3d 24] (*Salazar*).) Like the trial court, however, we conclude that under the plain language of the written employment agreement, plaintiff was not permitted to recover additional commissions after his termination. Accordingly, we affirm the grant of summary judgment.

## FACTUAL AND PROCEDURAL HISTORY

### I. *Plaintiff's Employment and the AT&T Transaction*[1]

Defendant hired plaintiff as a sales representative on October 4, 1999. On that date, the parties entered a written employment agreement, which provided (among other things) that (1) plaintiff was responsible for Web-hosting sales; (2) plaintiff's starting salary was $24,000 per year, plus commissions of 4 percent "on all direct initial sales"; (3) defendant "will be eligible for commission pay as set forth in this [document], so long as [plaintiff] remains employed with the Company as a Sales Representative"; and (4) the employment agreement "may be amended only by a written agreement executed by each of the parties hereto."

In April 2001, defendant promoted plaintiff to "Channel Manager." The parties entered a new oral agreement that provided (among other things) that (1) plaintiff's salary was increased to $75,000 per year, and (2) plaintiff would receive commissions of " '20% of the up front costs' revenues on all accounts brought in by [plaintiff] or through [plaintiff's] contacts or efforts."

In December 2000, plaintiff introduced himself to Vincent Salazar, then an agent for AT&T, at a networking event. Subsequent to that introduction, Salazar proposed to defendant and AT&T that defendant acquire all of AT&T's small- to medium-sized Web-hosting clients. Plaintiff "was not involved in the 'nuts and bolt' negotiations" concerning defendant's acquisition of AT&T's Web-hosting clients, but he "was responsible for procuring and advising HostPro of the potential to consummate a lucrative deal with AT&T." Further, he did not "at anytime solicit AT&T regarding the deal," but he "was responsible for engineering the getting together of AT&T and HostPro which ultimately led to the acquisition of AT&T's web hosting business by HostPro following months of extended negotiation by higher ups at HostPro."

Defendant terminated plaintiff on December 6, 2001. Subsequently, on January 14, 2002, defendant and AT&T executed an asset purchase agreement

---

[1] We state the facts in the light most favorable to the nonmoving party in accordance with the standard of review. (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 832 [31 Cal.Rptr.3d 565, 115 P.3d 1212] [review of summary judgment].)

pursuant to which defendant purchased all of AT&T's contractual rights relating to its small- and medium-sized Web-hosting customer accounts and the equipment used to service those customers.

After defendant and AT&T executed the asset purchase agreement, plaintiff sought compensation for his role in the transaction. Defendant has never paid plaintiff any commission in connection with the AT&T transaction.

## II. *The Present Action*

Plaintiff filed the present action on January 20, 2006. The operative second amended complaint, filed December 29, 2006, asserts four causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of Labor Code sections 206 and 2926; and (4) unfair business practices in violation of Business and Professions Code section 17200. It alleges that plaintiff entered an employment contract with defendant in 1999. The employment contract provided that plaintiff would market defendant's Web-hosting services and would be compensated by a salary and commissions of 4 percent. Later, plaintiff was promoted to manager and his commissions were increased to 20 percent. In this capacity, plaintiff initiated a deal with AT&T, valued at more than $12 million, pursuant to which defendant acquired all of AT&T's small- to medium-sized Web-hosting clients. However, approximately 30 days before the AT&T deal closed, defendant summarily terminated plaintiff and withheld his commissions.

Defendant moved for summary judgment. The trial court granted summary judgment on March 28, 2007, finding as follows:

1. *The entire action is barred because plaintiff was not a licensed broker at the time of the AT&T transaction.* Under the plain language of Business and Professions Code section 10030, the AT&T deal must be considered a "business opportunity" because it is indisputable that the sale of customers and assets constitutes a sale of AT&T's "business."[2] Thus, "[t]he analysis is straightforward: (1) a license is required to solicit prospective sellers of business opportunities; (2) the AT&T deal was a business opportunity; (3) Plaintiff solicited the AT&T deal; (4) Plaintiff did not have a license. Thus, Plaintiff's entire action for commission is barred under Bus. & Prof. Code §§ 10131 and 10136. The motion for summary judgment is granted on this basis."

2. *There is a triable issue of fact as to whether plaintiff is entitled to a commission under the terms of his employment contract.* "Defendant first

---

[2] All future statutory references are to the Business and Professions Code unless otherwise indicated.

argues that Plaintiff's Employment Agreement does not provide for Plaintiff to receive any commission for the AT&T transaction. Defendant argues that although Plaintiff alleges that the Employment Agreement was modified to provide him with a 20% commission on sales of new business brought in by him, no written agreement, modification, or addendum was ever executed. Furthermore, Defendant argues that the Employment Agreement by its terms provides that it may be amended or modified only by a writing signed by both parties. [Citations.] Plaintiff presents his declaration, in which he states the initial Employment Agreement was not amended, but that he entered into a new agreement when he was promoted to Channel Manager and that this agreement provided for a commission of 20%. . . . Plaintiff here argues that Defendant has redacted information from relevant pay records that would show that he was paid a 20% commission under the later agreement. There appears to be a triable issue of material fact as to whether Plaintiff entered into a new oral agreement. However, as stated above, the motion is nevertheless granted because Plaintiff did not possess a broker's license."

3. *Plaintiff was not entitled to any further commissions after his employment was terminated.* "[T]he Employment Agreement clearly states that Plaintiff will only be eligible for commission pay while he is employed as a Sales Representative. Plaintiff has not provided any authority showing that where an employment agreement is clear that commission payments cease upon termination, an employee is nevertheless entitled to commissions for transactions that he might have initiated as an employee but which were consummated after his termination."

4. *Plaintiff's claims are not barred by the statute of limitations.* "Defendants argue that all of Plaintiff's contract-related causes of action accrued on January 14, 2002, the date on which the AT&T transaction closed. . . . [¶] Plaintiff argues that his cause of action did not accrue until he received a letter from Defendant's counsel Michael French on April 28, 2004, which constituted an anticipatory repudiation. [Citation.] Plaintiff argues that prior to that date, Defendants had not given him any indication that he would not eventually receive a 20% commission on the AT&T deal. Defendants have not presented any evidence to the contrary. Since the action was filed on January 20, 2006, it is timely . . . ."

5. *Second cause of action: breach of the implied covenant of good faith and fair dealing.* "Defendants' arguments as to this cause of action are substantially identical to their arguments as to the first cause of action. Essentially, Defendants argue that Plaintiff did not have a contract entitling him to a 20% commission, and that the cause of action is time-barred. The above discussion applies equally to these arguments."

6. *Third cause of action: violation of the Labor Code.* "Defendant's arguments as to this cause of action are again substantially identical to those discussed above. Defendant argues that although commissions are wages under the Labor Code, contractual terms authorizing the commissions must be established before the wages are due. Defendant argues that the express terms of the contract prevent Plaintiff from obtaining commissions after he was terminated. As discussed above, the Court agrees."

7. *Fourth cause of action: unfair business practices.* "Where a UCL [unfair competition law] claim is derivative of another claim that fails as a matter of law, the UCL claim must similarly fail. [Citation.] As discussed above, Plaintiff's first three causes of action fail as a matter of law." "Plaintiff also argues that 'Defendants have not raised any credible challenge to plaintiff's UCL claim that defendant's practice of terminating its employees in order to avoid the payment of earned commission is a fraudulent business practice and thus prohibited by the UCL.' [Citation.] The Court is unable to find any allegation in the [second amended complaint] that Defendant had a practice of terminating its employees to avoid payment of commission. The pleadings serve as the 'outer measure of materiality' in a summary judgment motion, and the motion may not be granted or denied on issues not raised by the pleadings. [Citation.]"

Judgment was entered on June 22, 2007, and notice of entry of judgment was served on June 27, 2007. Plaintiff timely appealed.[3]

III. *The* Salazar *Litigation*

Meanwhile, in a separate action, Vincent Salazar (plaintiff's contact at AT&T) sued defendant for breach of contract and fraud on March 8, 2004. Salazar alleged that he was an agent of AT&T and was authorized to market Internet and Web-hosting services to small- and medium-sized businesses. In 2001, he advised defendant, which also provided Web-hosting services to small- and medium-sized businesses, that AT&T no longer wished to provide these services. Defendant expressed an interest in acquiring AT&T's small- and medium-sized business clients. On February 13, 2001, Salazar entered a written contract with defendant to market defendant's Web-hosting services to small- and medium-sized business customers and to arrange the acquisition of AT&T's small- and medium-sized business customers. Defendant represented to Salazar that he would receive a 10 percent commission on all monthly recurring fees received by defendant up to $10,000, a 20 percent commission on monthly recurring fees over $10,000, and a 5 percent commission

---

[3] Defendant cross-appealed on June 26, 2007, but dismissed the cross-appeal on October 22, 2007.

payment as a one-time setup fee for each customer acquired due to his efforts. However, defendant subsequently refused to pay Salazar the commissions allegedly due him. (*Salazar, supra,* 152 Cal.App.4th 1031, 1033–1034.)

Defendant moved for summary judgment, contending that Salazar could not recover the claimed commissions because he did not have a broker's license. On December 13, 2005, the trial court granted the motion.

Salazar appealed the grant of summary judgment, contending that the trial court erred in finding that the transaction between AT&T and defendant constituted the purchase and sale of a "business opportunity" under section 10131, subdivision (a). Specifically, Salazar argued that because only a small portion of AT&T's assets were sold, the sale did not constitute the sale of a business opportunity. (*Salazar, supra,* 152 Cal.App.4th at pp. 1035–1036.) On June 26, 2007, Division Two of this court disagreed and affirmed. It explained that although "business opportunity" under section 10030 includes the sale of an existing business enterprise, "there is no requirement that the sale include every business in which a corporation is engaged. Moreover, by using the term 'include' the definition is not necessarily limited to the inclusions. (*People v. Arnold* (2006) 145 Cal.App.4th 1408, 1414 [52 Cal.Rptr.3d 545], citing *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774 [117 Cal.Rptr.2d 574, 41 P.3d 575].) The plain language of the statute, therefore, does not support Salazar's contention that nothing short of the transfer of all the stock or assets of AT&T, or of one of its subsidiaries or divisions, could constitute the sale of a business opportunity." (*Salazar,* at p. 1037.)

Further, the court said, the transfer of a business opportunity as defined in section 10030 includes the transfer of those assets so essential that a business cannot continue without them and the transfer of future patronage or customers. It found undisputed proof of those attributes in the transaction between AT&T and Interland. (*Salazar, supra,* 152 Cal.App.4th at p. 1038.) The court concluded: "Given that AT&T, Interland and Salazar all characterize the transaction as the transfer of a business and a business opportunity, it is immaterial that the transaction involved less than 2 percent of AT&T's total base of its small business customers, or that AT&T continued to provide Web-hosting services to large clients, or that AT&T continued to provide other types of services to the small and medium clients. AT&T sold and Interland purchased the customer contracts, supporting equipment and pledge of nonsolicitation for six months that comprised AT&T's Web-hosting business for small to medium-sized clients. The undisputed evidence supports the conclusion that the transaction constituted the sale of a business opportunity." (*Id.* at p. 1040.)

Finally, the court rejected Salazar's contention that he was not seeking a commission for the transaction between Interland and AT&T but rather his share of the monthly fees paid by each customer as he is entitled to under his contract with Interland. "[T]he statute prohibits 'the collection of compensation' for acting as an unlicensed business opportunity broker regardless of how that compensation is characterized. (§ 10136; see also § 10131 [broker defined as one who 'for a compensation or in expectation of a compensation, regardless of the form or time of payment . . . .'].)" (*Salazar, supra,* 152 Cal.App.4th at p. 1041.)

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. "A defendant may move for summary judgment 'if it is contended that the action has no merit . . . .' ([Code Civ. Proc.,] § 437c, subd. (a).) 'A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' ([Code Civ. Proc.,] § 437c, subd. (p)(2).) 'The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' ([Code Civ. Proc.,] § 437c, subd. (c).)" (*McGarry v. Sax* (2008) 158 Cal.App.4th 983, 993 [70 Cal.Rptr.3d 519].)

"On appeal, we review the trial court's decision to grant or deny the summary judgment motion de novo, on the basis of an examination of the evidence before the trial court and our independent determination of its effect as a matter of law. [Citations.] We are not bound by the trial court's stated reasons or rationale. Instead, we review the summary judgment without deference to the trial court's determination of questions of law." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 [80 Cal.Rptr.2d 66].)

## DISCUSSION

I. *There Are Triable Issues of Fact as to Whether Plaintiff Is Precluded From Recovering a Commission Because He Was Not a Licensed Business Opportunity Broker*

Defendant's principal argument in support of summary judgment is that plaintiff is precluded from recovering a commission on the AT&T transaction because he was not a licensed business opportunity broker as

defined by sections 10131 and 10136. These sections provide that no person "engaged in the business or acting in the capacity of" (§ 10136) a real estate or business opportunity broker may "bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article" (*ibid.*) without alleging and proving that he or she was a duly licensed real estate or business opportunity broker at the time the alleged cause of action arose.[4] Because it is undisputed that plaintiff was not a licensed broker at the time he allegedly participated in the AT&T transaction, defendant contends that he cannot recover a commission for that participation.

Plaintiff disagrees. He contends that (1) he acted as a "finder," not a broker; (2) sections 10131 and 10136 should not apply to employees acting within the scope of their employment; (3) the AT&T transaction was not the sale of a "business opportunity" within the meaning of the statute; and (4) plaintiff did not "solicit[] prospective sellers or purchasers of" a business opportunity within the meaning of sections 10131 and 10136.

We begin by considering whether plaintiff is collaterally estopped by the Court of Appeal's opinion in *Salazar* from litigating whether the AT&T transaction constituted the sale of a business opportunity. We then consider on the merits whether sections 10131 and 10136 bar plaintiff's recovery.

A. *Plaintiff Is Not Collaterally Estopped by the Court of Appeal's Opinion in* Salazar *From Litigating Whether the AT&T Transaction Constituted the Sale of a Business Opportunity*

Defendant asserts that plaintiff is collaterally estopped by the Court of Appeal's opinion in *Salazar* from litigating whether the AT&T transaction constituted the sale of a business opportunity within the meaning of section 10030. For the reasons that follow, we disagree.

"Issue preclusion by collateral estoppel 'prevents "relitigation of issues argued and decided in prior proceedings." [Citation.]' (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481 [111 Cal.Rptr.2d 870]; see also *Bob Baker Enterprises, Inc. v. Chrysler Corp.* (1994) 30 Cal.App.4th 678, 686 [36 Cal.Rptr.2d 12].) The doctrine 'rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. Public policy and the interest of

---

[4] Although section 10136 refers to "real estate broker[s]," it also applies to persons who buy, sell, or solicit business opportunities unrelated to real property transactions. (See § 10131, subd. (a).)

litigants alike require that there be an end to litigation.' (*Panos v. Great Western Packing Co.* (1943) 21 Cal.2d 636, 637 [134 P.2d 242]; see also *Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1065 [71 Cal.Rptr.2d 77].)" (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89–90 [38 Cal.Rptr.3d 528] (*Rodgers*).)

" ' "Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].' . . ." [Citations.]' (*People v. Carter* (2005) 36 Cal.4th 1215, 1240 [32 Cal.Rptr.3d 838, 117 P.3d 544]; see also *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1015 [48 Cal.Rptr.2d 174].) 'In addition to these factors, . . . the courts consider whether the party against whom the earlier decision is asserted had a "full and fair" opportunity to litigate the issue.' (*Roos v. Red* (2005) 130 Cal.App.4th 870, 880 [30 Cal.Rptr.3d 446].) Collateral estoppel will not be applied 'if injustice would result or if the public interest requires that relitigation not be foreclosed.' (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)" (*Rodgers, supra,* 136 Cal.App.4th at p. 90.)

" 'The concept of privity for the purposes of . . . collateral estoppel refers "to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel. [Citations.]" [Citations.] " 'This requirement of identity of parties or privity is a requirement of due process of law.' [Citation.] . . ." [Citations.]' (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn., supra,* 60 Cal.App.4th 1053, 1069–1070; see also *Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 399 [134 Cal.Rptr.2d 689].)" (*Rodgers, supra,* 136 Cal.App.4th at pp. 90–91.)

We have no quarrel with the proposition that plaintiff and Salazar had a common interest in establishing that the AT&T transaction was not the sale of a business opportunity. Further, that common interest seems to have been represented adequately in the *Salazar* case. However, " ' "[c]ollateral estoppel may be applied only if due process requirements are satisfied. [Citations.] In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that

the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." ' (*Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1155 [81 Cal.Rptr.2d 155] . . . ; see also *George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 826 [128 Cal.Rptr.2d 586].) ' "The 'reasonable expectation' requirement is satisfied if the party to be estopped had a proprietary interest in and control of the prior action, or if the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for the party to be estopped. [Citations.] Furthermore, due process requires that the party to be estopped must have had a fair opportunity to pursue his claim the first time. [Citation.]" [Citation.]' (*Old Republic Ins. Co. v. Superior Court* (1998) 66 Cal.App.4th 128, 154 [77 Cal.Rptr.2d 642].) 'In deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need to minimize repetitive litigation and prevent inconsistent judgments.' (*Children's Hospital v. Sedgwick* (1996) 45 Cal.App.4th 1780, 1788 [53 Cal.Rptr.2d 725]; see also *Sutton v. Golden Gate Bridge, Highway & Transportation Dist., supra,* at p. 1155.)" (*Rodgers, supra,* 136 Cal.App.4th at p. 92, citation omitted.)

█ In *Rodgers,* the Court of Appeal applied these principles to conclude that the plaintiff, who alleged that he had been exposed to asbestos in the course of his employment, was not collaterally estopped from litigating issues decided adversely to other workers in asbestos litigation against the same defendant. Specifically, the court found that the plaintiff was not bound by findings against workers in prior cases that the defendant Sargent was not the successor in interest to other named defendants, even though those workers and the current plaintiff were represented by the same counsel. (*Rodgers, supra,* 136 Cal.App.4th at p. 86.) The court explained: "Appellant did not have any proprietary interest in the [prior] cases. While he had a theoretical 'interest' in the resolution of the successor liability issue in the prior cases—in that an outcome favorable to the plaintiffs would have been binding upon Sargent—he had neither incentive to intervene in those actions nor reason to expect he would be bound by decisions in which he did not participate. (*Old Republic Ins. Co. v. Superior Court, supra,* 66 Cal.App.4th 128, 154–155; *Lynch v. Glass* (1975) 44 Cal.App.3d 943, 949–950 [119 Cal.Rptr. 139].) ' "A nonparty should reasonably be expected to be bound if he had in reality contested the prior action even if he did not make a formal appearance," for example, by controlling it. [Citations.] Furthermore, privity appertains "against one who did not actually appear in the prior action . . . where the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for a nonparty." [Citation.]' (*Victa v. Merle Norman Cosmetics, Inc.* [(1993)] 19 Cal.App.4th 454, 464 [24 Cal.Rptr.2d

117].) The plaintiffs in the [prior] cases did not act as appellant's representatives, and appellant certainly had no control over or even impact upon the litigation that produced the decisions in favor of respondent. (*Old Republic Ins. Co. v. Superior Court, supra,* at p. 155; *Aronow v. LaCroix* (1990) 219 Cal.App.3d 1039, 1052 [268 Cal.Rptr. 866].) Although appellant, at least through his attorney, must have been aware of the prior litigation, he did not stand in a close relationship with the other two plaintiffs, had no control over the proceedings in the other cases, and cannot be charged with notice that he avoided the prior proceedings at his peril. (*Lynch v. Glass, supra,* at pp. 949–950.)" (*Rodgers,* at pp. 92–93.)

We reach the same conclusion here. There is no evidence that plaintiff had a proprietary interest in the *Salazar* litigation. While he may have had a theoretical interest in the resolution of common issues, he did not have an incentive to intervene in that action or a reason to expect that he would be bound by the decision there. There is no evidence that Salazar acted as plaintiff's representative or that plaintiff had any control over the *Salazar* litigation. Accordingly, plaintiff cannot be bound by the decision in *Salazar.*

B. *There Are Triable Issues Regarding Whether Plaintiff Was Required to Have a Broker's License to Receive Commissions*

As we have said, section 10136 provides that no person "engaged in the business or acting in the capacity of" a real estate broker may "bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article" without alleging and proving that he or she was a duly licensed real estate broker at the time the alleged cause of action arose. Pursuant to section 10131, subdivision (a), a "real estate broker" includes a person who "[s]ells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of . . . a business opportunity."

The *Salazar* court concluded that Salazar could not recover a commission as a matter of law because the AT&T transaction indisputably was the sale of a business opportunity. In other words, in determining whether sections 10131 and 10136 barred Salazar's recovery, the court focused on the nature of the transaction, rather than on Salazar's role in that transaction. (E.g., *Salazar, supra,* 152 Cal.App.4th at pp. 1033–1034 ["The trial court correctly found that the transaction was the sale of a business opportunity and that under Business and Professions Code section 10131, subdivision (a), Salazar was required to be licensed as a broker in order to recover compensation for arranging the sale or acquisition of this business."].) The trial court's analysis in the present case was similar. According to the court, "[t]he analysis is

straightforward: (1) a license is required to solicit prospective sellers of business opportunities; (2) the AT&T deal was a business opportunity; (3) Plaintiff solicited the AT&T deal; (4) Plaintiff did not have a license. Thus, Plaintiff's entire action for commission is barred under Bus. & Prof. Code §§ 10131 and 10136."

■ We read the statute somewhat differently. In our view, the relevant question is not whether the transaction met the statutory definition of a business opportunity, but rather whether plaintiff "[bought] or offer[ed] to buy," "solicit[ed] prospective sellers . . . of," or "negotiate[d] the purchase . . . of" a business opportunity. In other words, the focus of the inquiry should be *plaintiff's actions* in attempting to create a business relationship, not the form that the business relationship ultimately took. Under this analysis, plaintiff would come within the statute only if he ·"solicited" or "negotiated" the purchase or sale of a business opportunity. If, on the other hand, he "solicited" or "negotiated" a different kind of transaction, he would *not* come within the statute—even if the transaction ultimately was consummated as the purchase or sale of a business opportunity, rather than in the form plaintiff proposed.

In the present case, there was evidence that plaintiff solicited only the sale of defendant's Web-hosting services to AT&T, not the purchase of customer accounts from AT&T. Plaintiff testified that the initial concept he brought to AT&T was an "outsourcing relationship whereby HostPro would provide web hosting services to AT&T's small and medium business customers." The idea was "for HostPro to manage these accounts for AT&T . . . [v]ersus them managing it themselves and having all the overhead expenses." Plaintiff testified that after he made the initial contact with Vince Salazar, he was involved in two meetings with AT&T personnel. During the first meeting, "I just remember everyone sitting at our big conference table, and going around the room, introducing ourselves, and talking about—more about HostPro's services, and introducing them to the concept of, 'Hey, we would love to be the company that manages and maintains and hosts and provides the service to your customers[.]' [¶] . . . [¶] . . . [O]ur purpose was to build the relationship, create the excitement of allowing AT&T to see the vision of bringing their stuff to us versus them managing all of it themselves." The second meeting "was pretty much the same as the first meeting, but they got more serious about talking about the acquisition of their servers over to our servers. And I think it was more of a technical meeting. And it was a meeting that allowed HostPro to understand what AT&T's needs were. And we made it more clear what our goal was and what services and love and support we could offer them in the process." The discussion still was "for an outsourcing relationship."

Plaintiff also testified that in his dealings with AT&T, he never heard that AT&T was interested in selling its small- and medium-sized accounts:

"Q In the various meetings and teleconferences that you participated in between AT&T and HostPro, did the parties ever discuss AT&T putting their customer accounts up for bid?

"A No, I never—that's what was surprising when I saw the headlines, I never heard that at all.

"Q Did you ever hear that AT&T was interested in selling all those customer accounts?

"A That was a surprise to me, as well.

"Q So that's not something that was discussed in these meetings or conference calls?

"A Not in the preliminary meetings, no.

"Q Not in any of the meetings, correct?

"A Not in any of the meetings I was in, no. [¶] . . . [¶]

"Q [T]he concept was for AT&T to keep their customers and for HostPro—

"A Yeah, that was the understanding, sure."

Plaintiff's testimony, although disputed by defendant, is sufficient to create a triable issue as to whether plaintiff "offer[ed] to buy," "solicit[ed] prospective sellers . . . of," or "negotiate[d] the purchase . . . of" a business opportunity within the meaning of section 10131. On the basis of this testimony, a trier of fact reasonably could conclude that although the deal ultimately struck between defendant and AT&T was the purchase and sale of a business opportunity, that was not the deal plaintiff solicited or negotiated. Accordingly, the trial court erred by concluding that plaintiff's failure to procure a broker's license barred his recovery as a matter of law.

II. *There Are No Triable Issues of Fact as to the First Cause of Action for Breach of Contract*

The first cause of action asserts breach of the employment agreement. Defendant asserts that it is entitled to judgment on this cause of action as a matter of law because (1) the employment agreement provided that plaintiff

was entitled to a commission only while he was employed by the company, and it is undisputed that plaintiff's employment was terminated before defendant and AT&T finalized the asset purchase agreement; (2) by its plain language, the agreement did not entitle plaintiff to a commission when the company acquired new customers through an asset purchase agreement, rather than through the direct sale of the company's Web-hosting services; and (3) the breach of contract claim is barred by the statute of limitation. Plaintiff disputes defendant's interpretation of the employment agreement and asserts that his claim is not time-barred.

We begin by considering whether, as a matter of law, plaintiff's claims are barred because the AT&T transaction on which he bases his claim for additional commissions was consummated after plaintiff's termination. Defendant relies in support of this contention on the language of the parties' October 4, 1999 employment agreement. That agreement provided that plaintiff would receive a commission "with respect to all direct initial sales for which Employee is responsible." It further provided that plaintiff "will be eligible for commission pay . . . *so long as* [*he*] *remains employed with the Company as a Sales Representative*." (Italics added.)

■ We agree with defendant that, on its face, the italicized language is reasonably susceptible to only one interpretation—that once plaintiff ceased to be employed by defendant, he would no longer be eligible for commission pay. While plaintiff could have relied on extrinsic evidence (if there were such evidence) to suggest an alternative meaning of this provision, he did not do so. (Cf. *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1358 [8 Cal.Rptr.3d 649] ["[T]his extrinsic evidence of trade usage exposed a latent ambiguity in the contract language and presented an alter[n]ative interpretation to which the term 'gross receipts' was reasonably susceptible in the circumstances."].) Accordingly, we conclude as a matter of law that the written employment agreement precludes plaintiff from collecting additional commissions posttermination.

We also reject plaintiff's contention that summary judgment must be denied because there are triable issues as to the existence of an April 2001 oral employment agreement that did not include a termination clause. In support, plaintiff relies on his own declaration, in which he states that "[s]ubsequent to the initial Employment Agreement that I signed with HostPro, Inc., in 1999 for a four percent (4%) commission, I was promoted to Channel Manager and given a new agreement for '20% of the up front costs' revenues on all accounts brought in by me or through my contacts or efforts. [¶] . . . The 4% commission agreement was not amended. During the month of April 2001, a new agreement was entered into when I was promoted to Channel Manager and I was provided a new commission agreement of 20%,

new office, other amenities and new salary of $75,000.00." Further, plaintiff says, "Regarding the employment agreement and during the Premier Partner Program, it was never discussed or detailed by the Defendants[] in any of the meetings or bulletins that an earned commission would not be paid by terminating the employee."

█ Plaintiff's declaration arguably raises a triable issue as to the existence of an oral employment agreement. However, it is well established that "the pleadings set the boundaries of the issues to be resolved at summary judgment." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648 [32 Cal.Rptr.3d 266].) Accordingly, "[a] 'plaintiff cannot bring up new, unpleaded issues in his or her opposing papers. [Citation.]' [Citations.] A summary judgment or summary adjudication motion that is otherwise sufficient 'cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings.' [Citation.] Thus, a plaintiff wishing 'to rely upon unpleaded theories to defeat summary judgment' must move to amend the complaint before the hearing." (*Ibid.*)

In the present case, plaintiff's summary judgment contention that he and defendant entered an oral employment agreement in April 2001 was beyond the scope of the pleadings. Nowhere in the operative second amended complaint does plaintiff allege that the terms of his employment relationship with defendant were dictated by an oral agreement. To the contrary, plaintiff specifically alleges that modifications to his employment agreement were made in April 2001 in an addendum that was *"written."* Moreover, while plaintiff could have sought to amend his pleading to conform to proof even as late as the date of the summary judgment hearing, he never did so. (E.g., *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1257 [78 Cal.Rptr.3d 372] ["[I]f a plaintiff wishes to introduce issues not encompassed in the original pleadings, the plaintiff must seek leave to amend the complaint at or prior to the hearing on the motion for summary judgment."].) Accordingly, he may not avoid summary judgment by raising triable issues as to an oral employment agreement. (See, e.g., *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1201, fn. 5 [37 Cal.Rptr.3d 863] ["For the first time on appeal, Lackner argues that Mammoth failed to properly post signs in the area where the incident occurred, warning that the area is a rest stop where slowing should occur. Mammoth does not respond to this argument and we decline to address it because Lackner's complaint does not allege that Mammoth failed to post warning signs in the area of the collision. . . . Because Lackner's complaint fails to allege facts that give rise to a duty to post such signs, she may not assert Mammoth's breach of that duty."]; *Oakland Raiders v. National Football League, supra*, 131 Cal.App.4th at pp. 648–649 ["[T]he Additional Claims were beyond the scope of the second

cause of action of the complaint. . . . Therefore, any facts presented in the Raiders' opposition concerning the Additional Claims were properly disregarded in the court's ruling on the summary adjudication motion."].)[5]

III. *There Are No Triable Issues of Fact as to the Second Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing*

The second cause of action alleges breach of the implied covenant of good faith and fair dealing. Although this cause of action is not entirely clear, we understand plaintiff to allege that defendant breached the implied covenant by failing to pay commissions due him as a result of the AT&T transaction.

■ There are no triable issues of fact with regard to this cause of action. The implied covenant "is designed to effectuate the intentions and reasonable expectations of parties reflected by mutual promises within the contract." (*Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 806 [270 Cal.Rptr. 585], citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683–684 [254 Cal.Rptr. 211, 765 P.2d 373].) For this reason, it is well established that an implied covenant cannot create an obligation inconsistent with an express term of the agreement. (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1688 [60 Cal.Rptr.2d 195]; *Slivinsky v. Watkins-Johnson Co.*, at pp. 806–807.) We have already concluded that the express terms of the written employment agreement barred plaintiff from recovering commissions after his termination as a matter of law. Because the express terms of the agreement thus permitted defendant to deny plaintiff further commissions after his termination, doing so cannot violate the implied covenant.

Plaintiff also contends that defendant violated the implied covenant by "str[inging him] along for years" and "in a classic bait and switch[,] condition[ing] any payment on a resolution of [Salazar's] lawsuit." As we have concluded that failing to pay plaintiff additional commissions did not violate the express or implied terms of the employment contract, failing promptly to tell plaintiff that it would not do also does not violate the implied covenant.

At oral argument, plaintiff asserted that defendant terminated him in order to avoid paying his commission and argued this act frustrated the purpose of the contract. Because plaintiff neither alleged an unlawful basis for his termination nor advanced such an argument in the trial court, we do not address his claim.

---

[5] Because we have concluded that there are no triable issues of fact concerning the meaning of the written employment agreement, we do not reach defendant's alternative contentions regarding its entitlement to summary adjudication of this cause of action.

## IV. There Are No Triable Issues of Fact as to the Third Cause of Action for Labor Code Violations

The third cause of action alleges that defendant's failure to pay plaintiff additional commissions due him violates provisions of the Labor Code. Specifically, plaintiff alleges that "By refusing and/or neglecting to pay Plaintiff Nein the owed wages, defendants are in violation of Labor Code Section 2926 which provides that 'An employee who is not employed for a specified term and who is dismissed by his employer is entitled to compensation for services rendered up to the time of such dismissal.' " Plaintiff further alleges that "Defendants have continued to refuse to pay Plaintiff Nein the monies owed [that are] not in dispute, in violation of Labor Code Section 206(a) which provides inter alia that 'In case of a dispute over wages, the employer shall pay, without condition and within the time set by this article, all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed.' " (Boldface omitted.)

It is undisputed that commissions are "wages," and thus that plaintiff's claim for commissions falls within the terms of Labor Code sections 2926 and 206. (Lab. Code, § 200, subd. (a) [wages "includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation"]; *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696, 705 [24 Cal.Rptr.3d 351] ["commissions are 'wages' "].) However, for purposes of enforcing the provisions of the Labor Code, "[t]he right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." (*Koehl v. Verio, Inc.* (2006) 142 Cal.App.4th 1313, 1330 [48 Cal.Rptr.3d 749]; see also *Steinhebel*, at p. 705 ["contractual terms must be met before an employee is entitled to a commission"].) Accordingly, plaintiff's right to commissions "must be governed by the provisions of the [employment agreement]." (*Steinhebel*, at p. 705.) We have already concluded that, pursuant to the plain language of the written employment agreement, plaintiff was not entitled to any further commissions after he was terminated. Accordingly, defendant's failure to pay such commissions cannot constitute a violation of the Labor Code.[6]

---

[6] There is an exception to this principle when a contract provision is unconscionable. (*Ellis v. McKinnon Broadcasting Co.* (1993) 18 Cal.App.4th 1796, 1800, 1806 [23 Cal.Rptr.2d 80] [Term of employment agreement providing that advertising salesman forfeited his right to a commission if he terminated his employment before his employer received payment for advertising was unconscionable and unenforceable: "[T]he issue is simply a matter of when KUSI received payment for the advertising, which appears to turn on KUSI's billing cycle and the advertiser[']s payment practices instead of on anything [the salesman] did or did not do."];

Plaintiff asserts that even if he was not entitled to a commission under the terms of his contract, he has a valid quantum meruit claim. However, the sole case he cites in support, *Willson v. Turner Resilient Floors* (1949) 89 Cal.App.2d 589 [201 P.2d 406], does not address quantum meruit at all. It thus does not support his contention.

## V. There Are No Triable Issues of Fact as to the Fourth Cause of Action for Unfair Business Practices

■ The fourth cause of action alleges that defendant engaged in unfair business practices in violation of section 17200. Like the other causes of action, it too is based on defendant's conceded failure to pay him a commission in connection with the AT&T transaction. Because we have concluded that no commission was owed as a matter of law, defendant's failure to pay a commission cannot constitute an unfair business practice. (E.g., *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147 [135 Cal.Rptr.2d 796] ["A business practice that might otherwise be considered unfair or deceptive cannot be the basis of a Section 17200 cause of action if the conduct has been deemed lawful."].)

Plaintiff also asserts that defendant violated section 17200 through its "practice of terminating its employees in order to avoid the payment of earned commission." However, because plaintiff did not assert that claim in his complaint, it cannot form the basis for a denial of summary judgment. (*Oakland Raiders v. National Football League, supra*, 131 Cal.App.4th at p. 648 ["A summary judgment or summary adjudication motion that is otherwise sufficient 'cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings.' "].)

## VI. The Trial Court Did Not Abuse Its Discretion by Awarding Attorney Fees to Defendant

Plaintiff contends that because the grant of summary judgment was erroneous, the award of attorney fees was an abuse of discretion. We have concluded that the trial court did not err in granting summary judgment, and thus the award of attorney fees is not subject to reversal on this basis.

cf. *American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1388, 1393 [54 Cal.Rptr.2d 477] [Provision of plaintiff's employment contract that terminates her right to receive commissions on payments received on her accounts 30 days after severance of her employment held not unconscionable: "Our survey of case law indicates that the contract provision challenged here is commonplace in employment contracts with sales representatives, such as [plaintiff], who have ongoing responsibilities to 'service' the account once the sale is made."].) However, because plaintiff did not plead that his employment agreement was unconscionable, we do not reach the issue.

 Plaintiff also contends that the amount of the award should be significantly reduced as a matter of fairness. However, plaintiff fails to make a legal argument or to cite any legal authority in support of this contention. Therefore, it is forfeited on appeal. (*Berger v. California Ins. Guarantee Assn.* (2005) 128 Cal.App.4th 989, 1007 [27 Cal.Rptr.3d 583] [argument forfeited where parties "fail[ed] to make a coherent argument or cite any authority to support their contention"]; *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126] ["[P]arties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant[s'] [contentions] as waived."].)

## DISPOSITION

The judgment is affirmed. Defendant shall recover its costs on appeal.

Epstein, P. J., and Willhite, J., concurred.